IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**The State of Ohio and**
**Attorney General Bill Schuette on Behalf**
**of the People of Michigan,**

      **Plaintiffs,**

v.

**United States Army Corps of Engineers;**
**United States Environmental Protection**
**Agency; The Honorable Jo-Ellen Darcy**
**in her official capacity as Assistant**
**Secretary of the Army (Civil Works); and**
**The Honorable Gina McCarthy in her**
**official capacity as Administrator, U.S. E.P.A.**

      **Defendants.**

**Case No. 2:15-cv-02467**

**Judge _____**

## COMPLAINT

### INTRODUCTION

1. In the Clean Water Act, Congress has established federal regulatory control over "navigable waters," defined by that statute as "waters of the United States, including the territorial seas." 33 U.S.C. §§ 1344, 1362(7). This case involves a renewed effort by two federal agencies, in the face of contrary statutory language and Supreme Court precedent, to expand their regulatory scope far beyond those waters, and to claim authority over areas that federal law properly leaves to state supervision and care.

2. Although the United States Supreme Court has been attentive in rejecting previous improper attempts by these agency Defendants to expand the reach over which they

claim dominion, Defendants now have issued a new rule purporting to define the "waters of the United States" in a way that reaches far beyond the constraints established by Congress, the United States Constitution, and binding Supreme Court case law. DOD Clean Water Rule: Definition of Waters of the United States, 33 CFR Part 328; EPA Clean Water Rule: Definition of Waters of the United States, 40 CFR Parts 110 *et al.* (the "Rule").

3. The Rule propounded by Defendants does not limit their regulatory authority to "navigable waters." It does not limit their authority to navigable waters and waters or wetlands that abut and maintain a continuous surface connection with navigable waters. It does not even stop at continuously flowing streams that themselves feed directly into navigable waters. Rather, in sweeping terms, it purports to extend federal regulatory jurisdiction over broad swaths of the country, including vast areas within the States of Ohio and Michigan, that in no way constitute navigable, potentially navigable, or interstate waters – even in various instances reaching land that is typically dry.

4. Defendants trumpet that previously they "ultimately construed" the Supreme Court precedent set forth in *Solid Waste Agency of Northern Cook Cty. v. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ("*SWANCC*") "narrowly," while holding to a "broad interpretation" of their own powers. *U.S. EPA and U.S. Dept. of the Army, Technical Support Document* for the Clean Water Rule: Definition of Waters of the United States, at 27 (May 27, 2015), http://www2.epa.gov/cleanwaterrule/technical-support-document-clean-water-rule-definition-waters-united-states. The new Rule reflects that Defendants maintain their free-ranging approach despite *SWANCC* and *Rapanos v. United States*, 547 U.S. 715 (2006), in which the Supreme Court again declined to accept their sweeping jurisdictional claims.

5. Defendants' current interpretation of statutory jurisdiction runs afoul of the terms of the Clean Water Act and of Congress's injunction that, except as expressly provided, the law is not to be construed in a way "impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters … of such States." 33 U.S.C. § 1370(2). And their "narrow" interpretation of various Supreme Court admonitions contravenes binding case law. Defendants admit that even "compared to agency practice in light of guidance issued after *SWANCC* and *Rapanos*, the final rule is generally broader …." *Technical Support Document* at 33.

6. Thus, through their overreaching Rule, these federal agency Defendants injure the States of Ohio and Michigan as landowners, as regulators (including as regulators of State waters), as trustees of the natural resources of the States, as guardians of the interests of their residents, and as keepers of their sovereign territory.

7. The new Rule intrudes federal authority over intrastate "waters" entirely within the State of Ohio and Michigan, and right up to the doorsteps of Ohio and Michigan citizens (claiming federal authority, for example, to regulate an Ohio or Michigan property owner in fixing a depression in her yard that can fill with water in heavy rains, should the area be in a floodplain and anywhere within 1,500 feet of even a usually dry stream bed that can be deemed to connect with some other such feature that connects somehow with other similar land features that may on occasion take water to a tributary of a river or lake that actually is a navigable or interstate water).

8. Because Congress did not intend or authorize such a broad jurisdictional scheme in the Clean Water Act, and could not have done so consistent with the Constitution, and because the Rule conflicts with Supreme Court precedent, Defendants' final Rule violates the

Administrative Procedure Act.  The Rule is not lawful or reasonable, and should be enjoined and vacated.

## JURISDICTION AND VENUE

9. This action is authorized under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and arises from violations of the APA, the Clean Water Act, and the United States Constitution.  The Court has jurisdiction under 28 U.S.C. § 1331.

10. Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

## PARTIES

11. The State of Ohio is the largest land owner within its boundaries, and holds its lands, waters, and other natural resources in trust for the people of the State.  The State also regulates land and water within its borders, and recognizes the interest of its residents in both a safe and clean environment and a vibrant and growing economy that can sustain Ohio families and allow for continued and enhanced environmental protection.  Ohio further exercises delegated permitting authority pursuant to the terms of the Clean Water Act.  *See* 33 U.S.C. § 1342(b).

12. The State of Michigan (together with the State of Ohio, "States" or "Plaintiffs") owns and manages over 4.5 million acres of public land, the vast majority of which contain "waters" potentially affected by the proposed Rule.  The State of Michigan also comprehensively regulates land and water use within its borders consistent with the public health, safety, and welfare of its citizens.  Michigan is one of only two states to have delegated authority under both § 402 and § 404 of the Clean Water Act.  33 U.S.C. §§ 1342, 1344.

13. Defendant United States Environmental Protection Agency ("U.S. EPA") is an agency of the United States under the provisions of the Administrative Procedure Act.  Along

with Defendant United States Army Corps of Engineers, it has promulgated the final Rule at issue in this case.

14. Defendant United States Army Corps of Engineers ("U.S. Corps") is an agency of the United States under the provisions of the Administrative Procedure Act. Along with Defendant United States Environmental Protection Agency, it has promulgated the final Rule at issue in this case.

15. Defendant Gina McCarthy is Administrator of the United States Environmental Protection Agency, and is sued purely in her official capacity. Defendant McCarthy signed the final Rule on or about May 26, 2015 and submitted it for publication.

16. Defendant Jo-Ellen Darcy is Assistant Secretary of the Army (Civil Works) and supervises the United States Army Corps of Engineers; she is sued purely in her official capacity. Defendant Darcy signed the final Rule on or about May 26, 2015 and submitted it for publication.

## THE CHALLENGED RULE

17. The term "waters of the United States" marks the federal jurisdictional and regulatory scope of the Clean Water Act, which prohibits the discharge of any pollutant as defined to include materials such as dirt and sand into such waters absent a permit. 33 U.S.C. §§ 1311, 1362(6). The vast majority of States, including Ohio and Michigan, have delegated permitting authority relating to such waters from U.S. EPA through the National Pollution Discharge Elimination System ("NPDES"). *See* 33 U.S.C. § 1342(b). Michigan additionally has delegated permitting authority under the program regulating the discharge of dredged and fill material. *See* 33 U.S.C. § 1344.

18. On or about April 21, 2014, Defendants published in the Federal Register a proposed rule to redefine "waters of the United States" as that phrase relates to their regulatory jurisdiction. The comment period that they provided for the proposed rule ended on November 14, 2014.

19. By letter dated November 13, 2014 and submitted before the close of the comment period, Ohio Attorney General Mike DeWine in his capacity as Chief Legal Officer for the State of Ohio provided written comment noting the extraordinary overreach of the proposed rule in extending to areas far beyond the statutory limits. He suggested that Defendants replace their proposal with a more intelligible and appropriate rule consistent with the definition of "waters of the United States" as set forth in the Supreme Court plurality opinion in *Rapanos v. United States*, 547 U.S. 715 (2006). Other Ohio agencies also submitted comments on the proposed rule.

20. By letter dated November 14, 2014, Michigan Attorney General Bill Schuette provided written comment on the proposed rule. The comment letter initially noted that Michigan has administered both the § 402 and § 404 programs for decades, that it has its own set of comprehensive protections for waters within its borders, and that this was consistent with the state primacy Congress intended in enacting the Clean Water Act. 33 U.S.C. § 1251(b). Attorney General Schuette identified two primary deficiencies with the Rule: (1) the report which was the linchpin for the expansive reach of the Rule – "Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence" – was still in draft form, making meaningful comment on the purported scientific basis for the Rule impossible; and (2) the rule exceeded the regulatory limits set by the Supreme Court in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985), *SWANCC*, and *Rapanos*, through

an almost incomprehensible set of definitions that could be read to encompass vast swaths of the countryside.

21. On or about January 15, 2015, well after the close of the comment period, Defendants announced the release of the U.S. EPA's "Final Report" on *Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence*, which they aver "provides much of the technical basis for this rule." Rule, *Executive Summary*, 80 Fed. Reg. 37057. Defendants had not accepted or adopted that report as final at any time during the comment period.

22. On June 29, 2015, Defendants published their final Rule in the Federal Register. 80 Fed. Reg. 37054 *et seq.* In producing the final Rule, Defendants did not heed the concerns expressed by Attorneys General DeWine and Schuette and many other commenters relating to the overly-broad scope of federal jurisdiction now claimed, and they did not tailor the definition of "waters of the United States" to comply with the definition recited by the four-Justice plurality in *Rapanos* (or with Justice Kennedy's concurrence there, or with the Supreme Court's opinion in *SWANCC*).

**A.    "Tributaries" (no matter how far removed from actual waters of the U.S.)**

23. Instead, the final Rule issued by Defendants claims automatic and categorical federal jurisdiction, for example, over "all tributaries" to interstate waters and the territorial seas, with "tributary" defined to mean a water that contributes any "flow" whatsoever, "either directly or through another water," to an actual interstate or navigable water, and that "is characterized by the presence of the physical indicators of a bed and banks and an ordinary high water mark," and without regard to various constructed or natural breaks. *See, e.g.*, 33 C.F.R. 328.3(c)(3).

24. Defendants concede that "[u]nder the rule, flow in the tributary may be … intermittent, or ephemeral." Rule, *Definition of "Waters of the United States*, Subsection F, 80 Fed. Reg. 37076. That is, the claimed scope of federal jurisdiction extends even to minor creek beds and channels that are *usually dry*. And their Rule continues by asserting that even though the definition seems to specify that "flow" must be contributed "directly or through another water," Defendants actually contemplate that "to meet the rule's definition of 'tributary,' a water must flow directly or through another water *or waters* to a traditional navigable water, interstate water, or the territorial seas." *Id.* That is, "[a] tributary may contribute flow through *any number* of downstream waters, including non-jurisdictional features…." *Id*. (emphasis added). Thus, there is no limit to how far removed in the chain a tributary may be from "traditional" navigable waters in order to trigger categorical federal jurisdiction.

**B.     "Adjacent" (defined as both adjacent and non-adjacent)**

25. Defendants' reach beyond "traditional" navigable waters does not end with the ever-regressing trickle down to even "ephemeral" "tributaries." Defendants also, for example, assert an automatic and categorical regulatory claim to "[a]ll waters adjacent to" any "tributary" as so defined (as well as to any traditional navigable or interstate water), *see, e.g.,* 33 C.F.R. 328.3(a)(6), then define "adjacent" to mean not only "bordering," or "contiguous," but also "neighboring," *id*. at (c)(1) – and then define "neighboring" to include not only "[a]ll waters within 100 feet of the ordinary high water mark" of such a water, but also "[a]ll waters" within 1,500 feet of the "ordinary high water mark of such water" and within the 100-year floodplain of such water (and "[t]he entire water is neighboring if a portion is located within 1,500 feet of the ordinary high water mark and within the 100-year floodplain"), as well as "all waters" within

8

1,500 feet of the ordinary high water mark of the Great Lakes, or of the high tide line of a traditional navigable waterway or territorial sea. *See, e.g.,id.* at (c)(2).

26. Thus, through their Rule, Defendants purport to extend their jurisdiction categorically to "waters" (including various normally dry lands) as far as 1,500 feet from even typically dry and "ephemeral" creek beds. And while the Rule excludes a few such things as certain swimming pools (those "created in dry land") and "puddles" (which Defendants recite are "commonly considered … very small, shallow, and highly transitory pool[s] of water that form[ ] on pavement or uplands during or immediately after a rainstorm or similar precipitation event"), *see, e.g.,* 33 C.F.R. 328.3(b)(4)(iii) & (vii), 40 C.F.R. § 230.3(s)(2)(iv)(C) and (G), and Rule, *Definition of "Waters of the United States*, Subsection I, 80 Fed. Reg. 37099, it captures within the federal snare an enormous amount of other wet, damp, and (usually) dry areas. Moreover, Defendants "acknowledge" that the new Rule's adjacency provisions now extend even beyond wetlands to cover other "waters," Rule, *Definition of "Waters of the United States*, Subsection G(1), 80 Fed. Reg. 37084, and then repeat that "the language in the specific adjacency provision of the final rule *may have* changed from wetlands to waters." *Id*. (emphasis added).

**C.** **Other waters (and 4,000-foot margin rule)**

27. The Rule also purports to extend Defendants' regulatory jurisdiction potentially to "[a]ll waters" within the 100-year floodplain of a traditional navigable or interstate water or territorial sea, and also to "all waters located within 4,000 feet of the high tide line or ordinary high water mark" of any such water or of a "tributary" if "they are determined on a case-specific basis to have a significant nexus" to a traditional navigable or interstate water or territorial sea. *See, e.g.,* 33 C.F.R. 328.3(a)(8).

28.     "In this rule, the Agencies interpret '100-year floodplain' to mean 'the area that will be inundated by the flood event having a one-percent chance of being equaled or exceeded in any given year." Rule, *Definition of "Waters of the United States*, Subsection G(1), 80 Fed. Reg. 37081.

## THE RULE IS IN VIOLATION OF LAW

29.     In these and other respects, the Rule purports to extend Defendants' regulatory jurisdiction far beyond the "navigable waters" of the United States as to which Congress authorized federal oversight in the Clean Water Act. It thereby also disregards the determination of Congress to "recognize, preserve, and protect the primary responsibilities and rights of States … to plan the development and use … of land and water resources." 33 U.S.C. § 1251(b).

30.     In so doing, the Rule exceeds the powers granted to the federal government under the Constitution's Commerce Clause and infringes upon the authority reserved to the states and the people.

31.     The Rule also conflicts with United States Supreme Court precedent.

32.     For example, the Supreme Court made clear in *SWANCC* that "nonnavigable, isolated, intrastate waters" that do not actually abut on a navigable waterway do not come within the scope of "waters of the United States." 531 U.S. at 166-67, 171.

33.     But in each of the three jurisdiction-claiming mechanisms identified in paragraphs 23 through 28 above, Defendants seek to extend their jurisdiction into such territories. They do indeed read *SWANCC* far too "narrowly." *See also, e.g., Riverside Bayview*, 474 U.S. 121 (using "adjacent" in the usual sense of the word); *SWANCC*, 531 U.S. at 167 (noting that *Riverside Bayview* upheld the Corps' jurisdiction over wetlands "that actually abutted on a navigable waterway"), *id*. at 168 ("the text of the statute will not allow" a reading under which "the

10

jurisdiction of the Corps extends to ponds that are *not* adjacent to open water") (emphasis in original).

34. Moreover, Defendants' three jurisdiction-claiming mechanisms identified in paragraphs 23 through 28 above also conflict with the lines drawn by both the plurality opinion and Justice Kennedy's concurring opinion in *Rapanos*. In fact, the Rule appears informed far more by the *dissent* in *Rapanos* than by the four-Justice plurality or Justice Kennedy's concurrence: indeed, Defendants' *Technical Support Document* (at pages 37-40) in its introductory discussion of "Supreme Court Decisions" devotes five paragraphs and two and one-half pages to a fulsome discussion of the *Rapanos* dissent, while giving just one short-shrift paragraph each (and a total of one page) to the plurality and the Kennedy concurrence.

35. Justice Kennedy's *Rapanos* concurrence, for example, was highly skeptical of the view that even "wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small)" could be deemed jurisdictional as a matter of course. 547 U.S. at 776-77 (Kennedy, J., concurring).

36. Justice Kennedy also insisted on "the requirement that the word 'navigable' in 'navigable waters' be given some importance." *Id.* at 778. Indeed, he found that "the deference owed to the Corps' interpretation of the statute does not extend so far" as to "permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters." Defendants concede that "with this statement, Justice Kennedy is expressing concern about the categorical regulation of *wetlands* adjacent to remote and insubstantial ditches and drains." *Technical Support Document* at 76 (emphasis in original, and using "adjacent" in its dictionary sense of "lie alongside"). Although Defendants thus acknowledge that even a wetland that flows into traditional navigable waters

11

may be inappropriate for categorical regulation under Justice Kennedy's view, they nonetheless purport to regulate not only those features but others even far more removed.

37. Further, Justice Kennedy found that a standard covering tributaries that feed into a traditional navigable water (or a tributary thereof) and possess an ordinary high-water mark as indicated by certain physical characteristics – a standard so broad as to cover "streams remote from any navigable-in-fact water and carrying only minor water volumes toward it" – could not be adopted "as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood." 547 U.S. at 781. "Indeed, in many cases wetlands adjacent to tributaries covered by this standard might appear little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act's scope in *SWANCC*." *Id.* at 781-82.

38. Justice Kennedy further noted that "mere hydrologic connection should not suffice [for jurisdiction] in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood." *Id.* at 784-85.

39. The four-Justice plurality in *Rapanos*, for its part, also reiterated the *SWANCC* view that "the qualifier 'navigable' [in the statutory phrase "navigable waters"] is not devoid of significance." *Id.* at 731.

40. The plurality recited that "the waters of the United States include only relatively permanent, standing or flowing bodies of water" and does not extend federal jurisdiction to "channels containing merely intermittent or ephemeral flow." *Id.* at 733-34 (adding that in "applying the definition to 'ephemeral streams,' 'wet meadows,' [and the like] …, the Corps has

stretched the term 'waters of the United States' beyond parody.  The plain language of the statute simply does not authorize this 'Land is water' approach to federal jurisdiction.").

41. With regard to wetlands, the plurality found that "only those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are … covered by the Act." *Id.* at 742.

42. The plurality rejected the dissent's view that "would hold that 'the waters of the United States' include any wetlands 'adjacent' (no matter how broadly defined) to 'tributaries' (again, no matter how broadly defined) of traditional navigable waters." *Id.* at 746.  Yet Defendants with their new Rule make that same, rejected, overreaching claim of federal regulatory jurisdiction.

43. The limits drawn by Congress in the Clean Water Act and by the Supreme Court in both *SWANCC* and *Rapanos* preserve constitutional demarcations of authority that Defendants' approach breaches.

44. As "its authority for enacting" the Clean Water Act, Congress relied upon "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *SWANCC*, 531 U.S. at 172, citing *United States v. Appalachian Elec. Power Co.*, 311 U.S. 377, 407-08 (1940).

45. That constitutional grant under the Commerce Clause defines the outer bounds of federal authority here and limits the scope of permissible federal regulation.  The challenged Rule not only breaches but overwhelms that limitation, thereby not only violating the statute but also intruding on the authority preserved to the states and the people under the Tenth Amendment.

46. The Supreme Court underscored in *SWANCC* that it will "read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation." 531 U.S. at 174.

47. The Court noted its "assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority. [citation omitted.] This concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 172-73.

48. "Rather than expressing a desire to readjust the federal-state balance in this manner, Congress chose to 'recognize, preserve, and protect the primary responsibilities and rights of States … to plan the development and use of land and water resources'." *Id.* at 174 (also noting that "[p]ermitting respondents to claim [their asserted] federal jurisdiction … would result in a significant impingement of the States' traditional and primary power over land and water use.").

49. The *Rapanos* plurality echoed the same point. "Regulation of land use … is a quintessential state and local power…. The extensive federal jurisdiction urged by the Government would authorize the Corps to function as a *de facto* regulator of immense stretches of intrastate land…. We ordinarily expect a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority…. The phrase 'the waters of the United States' hardly qualifies…. Even if [it] were ambiguous as applied to channels that sometimes host ephemeral flows of water (which it is not), we would expect a clearer statement from Congress to authorize an agency theory of jurisdiction that presses the envelope of constitutional validity." 547 U.S. at 738.

50. The jurisdiction now claimed by Defendants under the Rule is inconsistent with the Clean Water Act, and for Congress to have authorized such federal reach would have exceeded the powers granted under the Commerce Clause and violated the Constitution's structural federalism protections and the Tenth Amendment.

### COUNT ONE – VIOLATION OF THE
### ADMINISTRATIVE PROCEDURE ACT THROUGH VIOLATION OF THE CLEAN WATER ACT AND THE U.S. CONSTITUTION

51. Plaintiffs restate and reallege each of the statements and allegations set forth in paragraphs 1-50 above.

52. The Congress of the United States has authorized this Court in such matters to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

53. Congress further has waived sovereign immunity as to claims brought under the Administrative Procedure Act.

54. Pursuant to the Administrative Procedure Act, the Court shall "hold unlawful and set aside agency action" that is: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

55. Defendants' final Rule purporting to define the jurisdictional "waters of the United States" to extend far beyond the authority provided by Congress or the Constitution is unlawful, arbitrary, capricious, an abuse of discretion, contrary to constitutional limits, in excess of statutory jurisdiction, authority, and limitations, and short of statutory right: the Rule should be set aside. 5 U.S.C. § 706(2).

56. The Rule also was promulgated in violation of the notice and comment procedures required by the Administrative Procedure Act. *See* 5 U.S.C. §§ 553(b)-(c); 706(2).

57. The States have no adequate administrative remedy available to them; alternatively, any further effort to obtain administrative relief would be futile.

58. The States are injured by the Rule in their capacities as landowners, regulators, and trustees, and have no adequate remedy at law apart from this claim and action.

**COUNT TWO – VIOLATION OF THE STRUCTURAL FEDERALISM PROVISIONS OF THE UNITED STATES CONSTITUTION INCLUDING THE TENTH AMENDMENT**

59. Plaintiffs restate and reallege each of the statements and allegations set forth in paragraphs 1-58 above.

60. As the Supreme Court reminded Defendant Corps in *SWANCC*, "the grant of authority to Congress under the Commerce Clause, though broad, is not unlimited."

61. The Supreme Court there "read the statute as written to avoid the significant constitutional and federalism questions raised by respondents' interpretation, and therefore reject[ed a] request for administrative deference."

62. Were the statutory basis Defendants claim for the Rule nonetheless to provide the jurisdictional scope they assert in the three jurisdiction-claiming mechanisms specified in paragraphs 23 through 28 above, it "would result in a significant impingement of the States' traditional and primary power over land and water use," *id.*, and would exceed the Commerce Clause powers of the federal government and violate the Tenth Amendment.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court:

- enter judgment in favor of Plaintiffs and against Defendants on this Complaint;

- vacate and set aside the Rule and preliminarily and permanently stay and enjoin Defendants from seeking to claim jurisdiction thereunder;

- return the matter to the Defendants to permit the Agencies to propose a new rule that is consistent with the terms of the Clean Water Act and the Constitution of the United States, and that clearly and appropriately defines the scope and limits of federal jurisdiction regarding "navigable waters" of the United States; and

- provide all further relief that equity demands or counsels.

Respectfully submitted,

MICHAEL DEWINE (0009181)
Ohio Attorney General

*/s/ Lee Ann Rabe*

LEE ANN RABE (0077170)
* Trial Counsel (for all Plaintiffs)
D. REES ALEXANDER (0090675)
(*PHV pending*)
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, OH 43215
614-466-7447 – Telephone
614-644-9185 – Facsimile
LeeAnn.Rabe@OhioAttorneyGeneral.gov
Rees.Alexander@OhioAttorneyGeneral.gov

FREDERICK D. NELSON (0027977)
Senior Advisor to Ohio Attorney General DeWine
30 East Broad Street, 17th Floor
Columbus, OH 43215
614-728-4947 – telephone
Frederick.Nelson@OhioAttorneyGeneral.gov

*Counsel for Plaintiff State of Ohio*

BILL SCHUETTE
Michigan Attorney General

S. Peter Manning
Division Chief

DANIEL P. BOCK (71246)
(*PVH pending*)
Assistant Attorney General
Environment, Natural Resources, and
Agriculture Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 373-7540 – Telephone
(517) 373-1610 – Facsimile
bockd@michigan.gov

*Counsel for Plaintiff State of Michigan*