IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF OHIO et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 2:15-cv-02467 |
| | ) | |
| v. | ) | Chief Judge Sargus |
| | ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY et al., | ) | Magistrate Judge Jolson |
| | ) | |
| Defendants, | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL et al., | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |

**DEFENDANT-INTERVENORS' COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant-Intervenors cross-move for summary judgment on Plaintiffs' claims and oppose Plaintiffs' motion for summary judgment, for the reasons given in the accompanying memorandum of law. If the Court reaches the merits of the case, it should deny Plaintiffs' motion and grant Defendant-Intervenors' cross-motion because Plaintiffs not only fail to support their merits arguments, but also have not shown that they would suffer any irreparable harm from the Clean Water Rule that would warrant injunctive relief.

Respectfully submitted this 1st day of November, 2021.

<div style="margin-left:40%">

<u>s/ Rebecca J. Riley</u>
*Trial Attorney*

Rebecca J. Riley
Jolie McLaughlin, admitted *pro hac vice*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 651-7913
Email: rriley@nrdc.org, jdmclaughlin@nrdc.org

Catherine M. Rahm, admitted *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Phone: (212) 727-4628
Email: crahm@nrdc.org

*Counsel for Defendant-Intervenors*
*Natural Resources Defense Council and*
*National Wildlife Federation*

</div>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... vi

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 3

I.      The Clean Water Act and "waters of the United States" ........................................ 3

The Clean Water Act's protections apply to "waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court's most recent decision interpreting "waters of the United States," *Rapanos v. United States*, 547 U.S. 715 (2006), resulted in a split decision with no majority opinion. In an opinion concurring in the judgment, Justice Kennedy found that a wetland has the requisite "significant nexus"—and is therefore a "water of the United States"—if "either alone or in combination with" other similarly situated wetlands, it "significantly affect[s] the chemical, physical, and biological integrity" of a traditional navigable water. *Id.* at 779-80. Every Court of Appeals to have decided the question has held that waters meeting Justice Kennedy's significant nexus test qualify as "waters of the United States."

II.     The Clean Water Rule ................................................................................. 7

In formulating the Clean Water Rule, the Agencies identified the significant nexus standard as the key to their interpretation of the Act. 80 Fed. Reg. 37,054, 37,060 (June 29, 2015). The Rule protected "tributaries" and "adjacent" waters as "waters of the United States," 33 C.F.R. § 328.3(a)(5)-(6) (2016), based on the scientific evidence that they significantly affect the integrity of traditional navigable waters, 80 Fed. Reg. at 37,058. Under the Rule, certain other waters could qualify for protection on a case-by-case basis, if they were shown to have a significant nexus. 33 C.F.R. § 328.3(a)(8) (2016). As compared to the text of the preexisting regulations, the Rule *narrowed* the scope of waters protected under the Clean Water Act. 80 Fed. Reg. at 37,054.

III.    Litigation challenging the Clean Water Rule and subsequent rulemakings .... 10

Several parties, including Ohio and Tennessee, filed challenges to the Clean Water Rule. In October 2019, the Agencies repealed the Clean Water Rule. That repeal rule—which recodified the regulatory definition of "waters of the United States" that preceded the Clean Water Rule—is currently in effect. The Agencies have announced an intent to issue new regulatory definitions of "waters of the United States." They have not stated any intent to re-issue the Clean Water Rule. Every other case challenging the Clean Water Rule, except this one, has been dismissed or stayed.

STANDARD OF REVIEW .................................................................................. 15

ARGUMENT ...................................................................................................... 16

i

**I.  The Rule complied with the Clean Water Act and Supreme Court precedent**................................................................................................ 16

The Rule was consistent with the significant nexus standard and the Clean Water Act because the scientific record shows that tributaries and adjacent waters (as defined by the Rule) significantly affect the integrity of traditional navigable waters, as do waters covered under the Rule's case-specific significant nexus analysis.

**A.  The Rule lawfully used the "significant nexus" standard**........................ 17

Every circuit court that has decided the question agrees that the Agencies may treat waters as "waters of the United States" if the waters satisfy the significant nexus standard. It was therefore reasonable for the Agencies to use that standard in the Rule as the touchstone for determining which waters qualify for protection under the Act.

**B.  The Rule lawfully protected certain categories of nonnavigable waters as "waters of the United States"**........................................ 19

Plaintiffs' assertion that the Agencies may only establish categorical protections for navigable-in-fact waters is baseless. The law is clear that the Agencies may categorically regulate waters that are not traditionally navigable. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 135 n.9 (1985); *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring in the judgment).

**C.  The Rule satisfied the "significant nexus" standard** ................................. 19

**1.  Tributaries, as defined, have a significant nexus** ........................... 20

The science supported the Agencies' conclusion that tributaries, as defined in the Rule, have a significant nexus to traditional navigable waters and therefore qualify as "waters of the United States." The science shows that all tributary streams "exert a strong influence on the integrity of downstream waters." McLaughlin Decl. Ex. 1, Connectivity Report at ES-2. The science also directly contradicts Plaintiffs' argument that the Rule was inconsistent with the significant nexus standard because it included streams that are "normally dry." Pls.' Br. 29, PageID #1281. The evidence of connectivity and downstream effects of ephemeral streams is "strong and compelling." McLaughlin Decl. Ex. 1, Connectivity Report at ES-7. Moreover, the Agencies properly considered the cumulative influence of streams, not simply each stream's individual impact. Plaintiffs also lack support for their claim that the Rule unlawfully protected tributaries that "indirectly" connect to traditional navigable waters. Pls.' Br. 29, PageID #1281. Excluding streams with indirect connections would be inconsistent with both the Clean Water Act and the significant nexus standard.

**2.  Adjacent waters, as defined, have a significant nexus** .................. 24

The science shows that waters included in the Rule's adjacent waters definition satisfy the significant nexus standard. First, the Rule's adjacent waters definition included waters within 100 feet of another federally protected water. 33 C.F.R.

§ 328.3(c)(2) (2016). Those waters are often connected to the river network via surface or subsurface flow, and wetlands with subsurface or surface connections "clearly" affect downstream waters. McLaughlin Decl. Ex. 1, Connectivity Report at ES-3. Waters within 100 feet of the river network are also often riparian waters, which "profoundly influence downstream water integrity." *Id.* at ES-7. Second, the Rule's adjacent waters definition included waters within the 100-year floodplain and within 1,500 feet of another federally protected water. *See* 33 C.F.R. § 328.3(c)(2) (2016). All floodplain wetlands "profoundly influence" the integrity of downstream waters, McLaughlin Decl. Ex. 1, Connectivity Report at ES-7, and are "highly connected" to them, *id.* at 4-39. The Agencies imposed the 1,500-foot limit to protect floodplain waters that "most clearly" have the requisite nexus. 80 Fed. Reg. at 37,085. Because the Rule protected adjacent waters on the basis that they significantly influence the integrity of traditional navigable waters, the Rule was fully consistent with *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001).

3.    The Rule's use of a case-specific analysis for some waters complied with the "significant nexus" standard ............................ 27

The Rule allowed certain waters to qualify as "waters of the United States" if a case-specific analysis showed that the water, either alone or in combination with other similarly situated waters, has a significant nexus to a traditional navigable water. 80 Fed. Reg. at 37,087-91. First, contrary to Plaintiffs' claims, the Agencies' consideration of similarly situated waters was consistent with Justice Kennedy's *Rapanos* opinion, as well as the advice of EPA's Science Advisory Board. Second, Plaintiffs provide no support for their view that it was improper for the Agencies to consider "many things" as relevant to the significant nexus analysis. Pls.' Br. 32, PageID #1283. To the contrary, most of the functions listed by the Agencies were expressly identified as relevant by the Supreme Court. *See Rapanos*, 547 U.S. at 775, 779, 786 (Kennedy, J., concurring in the judgment); *Riverside Bayview Homes*, 474 U.S. at 134-35. And Plaintiffs' suggestion that waters cannot satisfy the significant nexus test if they perform "just one" significant function, Pls.' Br. 32, PageID #1283, is again wholly unsupported and makes no sense in light of the statute's objective.

II.    **Plaintiffs' constitutional arguments are meritless** ................................................ 29

Plaintiffs' constitutional arguments are based on the false premise that the Rule "capture[d] many waters with no significant nexus to traditional navigable waters." Pls.' Br. 33, PageID #1285. As explained above, the evidence refutes such claims. Congress's Commerce Clause authority extends to navigable waters and waters that significantly affect them. The Rule was therefore permissible under the Commerce Clause. And because waters covered by the Rule are properly regulated under the

Commerce Clause, the Rule did not violate the Tenth Amendment by "intrud[ing]" on the States' "reserved powers," as Plaintiffs claim, *see id.*

III.    **Plaintiffs' Administrative Procedure Act arguments are meritless** ................... 30

    A.    **Plaintiffs' arbitrary-and-capricious arguments fail**.................................... 30

Plaintiffs' arbitrary-and-capricious arguments repeat some of the same claims—and mistakes—they make in arguing that the Rule violated the Clean Water Act. Plaintiffs' remaining attacks on the Rule's "adjacent" waters definition are equally flawed. First, they criticize the Agencies for using "bright-line distance thresholds," instead of functional relationships. Pls.' Br. 39, PageID #1291. But the Agencies defined adjacency based on "*both* functional relationships *and* proximity." 80 Fed. Reg. at 37,064 (emphasis added). Second, the Rule's distance thresholds in the adjacency definition were supported by science and adequately explained. The question is whether the distance limits were "within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), not whether the numbers were precisely right.

    B.    **Plaintiffs' notice-and-comment arguments fail** .......................................... 33

A final rule must be a "logical outgrowth" of the rule originally proposed. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The distance limits in the Rule's adjacency definition satisfied that standard because the Agencies made clear that they were contemplating using distance limits to define adjacency. Plaintiffs' complaint that they did not receive adequate notice of the Rule's 4,000-foot limit on waters subject to a case-by-case significant nexus analysis is also meritless because Plaintiffs cannot show prejudice from a perceived lack of notice of that narrowing change. *See* 5 U.S.C. § 706(2); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020); *Chrysler Corp. v. Dep't of Transp.*, 472 F.2d 659, 680-81 (6th Cir. 1972). Finally, there is no merit to Plaintiffs' claim that the Rule violated the APA because the preamble explained that the Agencies could use "remote sensing" and "desktop tools" to identify whether a tributary once had a bed, banks, or ordinary high water mark that no longer exist. Because this was at most a minor change relative to the proposal, it did not violate the APA. *See Chrysler Corp. v. Dep't of Transp.*, 515 F.2d 1053, 1061 (6th Cir. 1975).

IV.    **Plaintiffs fail to show that an injunction is warranted** ......................................... 36

To obtain an injunction, a plaintiff must face a "likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002); *City of Parma v. Levi*, 536 F.2d 133, 135 (6th Cir. 1976). Plaintiffs cannot make this showing. Even assuming it is "'reasonably' likely" that the Clean Water Rule may again become effective someday, *see Ohio v. EPA*, 969 F.3d 306, 310 (6th Cir. 2020), Plaintiffs fail to show that the Rule did or will cause them irreparable harm. Their claims of harm either repackage meritless legal arguments or constitute unsupported factual allegations. Nor do Plaintiffs point to

any concrete action they wanted to take and were prevented from taking as a result of the Rule. Plaintiffs' claims of irreparable harm therefore fail. Plaintiffs also fail to show that the public interest and the "balance of equities" favor permanently enjoining the Rule. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Plaintiffs' challenges to the legality of the Rule are meritless; thus, an injunction would not ensure the right application of "the law," *contra* Pls.' Br. 49, PageID #1301. Nor would an injunction promote "uniformity," as Plaintiffs suggest, *see id*. Plaintiffs fail to show why enjoining the Clean Water Rule, which presently has no effect, serves the public interest.

**CONCLUSION** ................................................................................................................... 42

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ................................................................................................... 39

*Akiachak Native Cmty. v. Jewell,*
    995 F. Supp. 2d 7 (D.D.C. 2014) ................................................................................ 40

*Barnes v. E-Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan,*
    501 U.S. 1301 (1991) ..................................................................................................... 39

*Baze v. Parker,*
    632 F.3d 338 (6th Cir. 2011) ...................................................................................... 39

*Chamber of Com. of U.S. v. EPA,*
    642 F.3d 192 (D.C. Cir. 2011) ..................................................................................... 3

*Chrysler Corp. v. Dep't of Transp.,*
    472 F.2d 659 (6th Cir. 1972) ...................................................................................... 35

*Chrysler Corp. v. Dep't of Transp.,*
    515 F.2d 1053 (6th Cir. 1975) .................................................................................... 36

*Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson,*
    236 F.3d 1174 (10th Cir. 2000) ................................................................................... 3

*City of Los Angeles v. Lyons,*
    461 U.S. 95 (1983) ........................................................................................................ 36

*City of Parma v. Levi,*
    536 F.2d 133 (6th Cir. 1976) ...................................................................................... 37

*County of Maui v. Haw. Wildlife Fund,*
    140 S. Ct. 1462 (2020) ................................................................................................... 24

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) ............................................................................................... 36, 42

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ................................................................................................... 33

*Georgia v. Pruitt,*
    326 F. Supp. 3d 1356 (S.D. Ga. 2018) ..................................................................... 12

vi

*Georgia v. Wheeler,*
 418 F. Supp. 3d 1336 (S.D. Ga. 2019) ............................................................ 12

*Georgia v. Wheeler,*
 No. 15-cv-79, 2020 WL 6948800 (S.D. Ga. Jan. 3, 2020) ............................ 3, 12, 14, 41

*Hodel v. Va. Surface Mining & Recl. Ass'n,*
 452 U.S. 264 (1981) ........................................................................................ 4

*In re EPA,*
 803 F.3d 804 (6th Cir. 2015) .............................................................. 11, 35, 40

*In re U.S. Dep't of Def.,*
 713 F. App'x 489 (6th Cir. 2018) ...................................................... 11, 35, 40

*Jackson v. Abercrombie,*
 585 F. App'x 413 (9th Cir. 2014) ....................................................................... 3

*Kaiser Aetna v. United States,*
 444 U.S. 164 (1979) ....................................................................................... 29

*Kallstrom v. City of Columbus,*
 136 F.3d 1055 (6th Cir. 1998) ....................................................................36-37

*Kansas v. United States,*
 249 F.3d 1213 (10th Cir. 2001) ...................................................................39-40

*Leyse v. Clear Channel Broad., Inc.,*
 545 F. App'x 445 (6th Cir. 2013) ................................................................... 35

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
 140 S. Ct. 2367 (2020) .................................................................................... 35

*Long Island Care at Home, Ltd. v. Coke,*
 551 U.S. 158 (2007) ....................................................................................... 33

*Maryland v. King,*
 567 U.S. 1301 (2012) ..................................................................................... 39

*Mashantucket Pequot Tribe v. Town of Ledyard,*
 722 F.3d 457 (2d Cir. 2013) .......................................................................... 40

*Miller v. Benson,*
 68 F.3d 163 (7th Cir. 1995) .............................................................................. 3

vii

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ........................................................................................................ 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .......................................................................................................... 15

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ........................................................................................................ 15

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018) ...................................................................................................... 11

*Navajo Nation v. Regan,*
    --- F. Supp. 3d ---, 2021 WL 4430466 (D.N.M. Sept. 27, 2021) ................................... 13

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................................................... 3, 30

*North Dakota v. EPA,*
    127 F. Supp. 3d 1047 (D.N.D. 2015) ............................................................................ 12

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ........................................................................................................ 36

*Ohio v. EPA,*
    969 F.3d 306 (6th Cir. 2020) ...................................................................................... 3, 37

*Oklahoma ex rel. Hunter v. EPA,*
    No. 15-cv-381, 2019 WL 2288446 (N.D. Okla. May 29, 2019) ................................... 12

*Overstreet v. Lexington-Fayette Urb. Cnty. Gov't,*
    305 F.3d 566 (6th Cir. 2002) ..................................................................................... 37-38

*Pascua Yaqui Tribe v. EPA,*
    --- F. Supp. 3d ---, 2021 WL 3855977 (D. Ariz. Aug. 30, 2021) .................................. 13

*PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology,*
    511 U.S. 700 (1994) .......................................................................................................... 4

*Rapanos v. United States,*
    547 U.S. 715 (2006) ................................................ 2, 6, 17, 18, 19, 22, 23, 26, 27, 28, 30

*Sackett v. EPA,*
    566 U.S. 120 (2012) ........................................................................................................ 26

*Sackett v. EPA,*
    8 F.4th 1075 (9th Cir. 2021) ........................................................................... 18

*Solid Waste Agency of N. Cook Cnty. (SWANCC) v. U.S. Army Corps of Eng'rs,*
    531 U.S. 159 (2001) ....................................................................... 5, 17-18, 26

*State of Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.,*
    766 F.2d 228 (6th Cir. 1985) ......................................................................... 39

*Summit Petroleum Corp. v. EPA,*
    690 F.3d 733 (6th Cir. 2012) ......................................................................... 27

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) .......................................................... 12

*Texas v. EPA,*
    No. 15-cv-162, 2018 WL 4518230 (S.D. Tex. Sept. 12, 2018) ..................... 12

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ......................................................................... 39

*United States v. Ashland Oil & Transp. Co.,*
    504 F.2d 1317 (6th Cir. 1974) ......................................................... 1, 4, 24, 30

*United States v. Bailey,*
    571 F.3d 791 (8th Cir. 2009) ......................................................................... 18

*United States v. Cundiff,*
    555 F.3d 200 (6th Cir. 2009) ................................................................... 18, 29

*United States v. Donovan,*
    661 F.3d 174 (3d Cir. 2011) .......................................................................... 18

*United States v. Gerke Excavating, Inc.,*
    464 F.3d 723 (7th Cir. 2006) ......................................................................... 18

*United States v. Johnson,*
    467 F.3d 56 (1st Cir. 2006) ........................................................................... 18

*United States v. Riverside Bayview Homes, Inc.,*
    474 U.S. 121 (1985) ................................................................ 1, 5, 17, 19, 28

*United States v. Robison,*
    505 F.3d 1208 (11th Cir. 2007) ..................................................................... 18

**Statutes**

5 U.S.C. § 706(2) ........................................................................................................ 15, 35

33 U.S.C. § 1251(a) .................................................................................................. 1, 17, 28

33 U.S.C. § 1311(a) ............................................................................................................ 4

33 U.S.C. § 1342 ................................................................................................................ 4

33 U.S.C. § 1342(b) ............................................................................................................ 4

33 U.S.C. § 1344 ................................................................................................................ 4

33 U.S.C. § 1344(g) ............................................................................................................ 4

33 U.S.C. § 1362(7) ........................................................................................................ 1, 4

33 U.S.C. § 1370 ........................................................................................................... 4, 39

Ohio Rev. Code Ann. § 6111.04 ....................................................................................... 40

**Regulations**

33 C.F.R. § 320.4(b)(2)(i) (1985) ..................................................................................... 28

33 C.F.R. § 328.3 (2016) .................................................................................................. 10

33 C.F.R. § 328.3(a) (2014) ........................................................................................... 9, 10

33 C.F.R. § 328.3(a) (2016) ............................................................................................. 8, 9

33 C.F.R. § 328.3(b) (2016) ............................................................................................. 8, 9

33 C.F.R. § 328.3(c) (2016) ..................................................................................... 8, 9, 20, 25

42 Fed. Reg. 37,122 (July 19, 1977) ................................................................................. 5

51 Fed. Reg. 41,206 (Nov. 13, 1986) ................................................................................ 5

79 Fed. Reg. 22,188 (Apr. 21, 2014) ............................................................................ 34, 36

80 Fed. Reg. 37,054 (June 29, 2015) ...... 7, 8, 9, 10, 20, 21, 22, 24, 25, 26, 27, 28, 31, 32, 33, 35

83 Fed. Reg. 32,227 (July 12, 2018) ................................................................................ 29

84 Fed. Reg. 56,626 (Oct. 22, 2019) ................................................................................ 12

x

85 Fed. Reg. 22,250 (Apr. 21, 2020) ...................................................................... 12

86 Fed. Reg. 41,911 (Aug. 4, 2021)........................................................................ 14

**Other Authorities**

118 Cong. Rec. 33,756 (1972) ................................................................................. 4

S. Rep. No. 92-414 (1971), *as reprinted in* 1978 U.S.C.C.A.N. 3668 ........................................ 3

## INTRODUCTION

The Clean Water Act's objective is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that objective, the Act regulates the pollution of "navigable waters," which the statute defines broadly as "the waters of the United States." *Id.* § 1362(7). The Supreme Court has recognized that the term "navigable" as used in the statute "is of limited import." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 133 (1985). Thus "waters of the United States" include not only navigable-in-fact waters, but also smaller streams and wetlands that are connected to—and significantly affect—those navigable-in-fact waters. *See United States v. Ashland Oil & Transp. Co.*, 504 F.2d 1317, 1323 (6th Cir. 1974) ("Congress' clear intention . . . was to effect marked improvement in the quality of the total water resources in the United States, regardless of whether that water was at the point of pollution a part of a navigable stream.").

For many years, the scope of "waters of the United States" was a source of confusion and uncertainty. In 2015, the U.S. Environmental Protection Agency and U.S. Army Corps of Engineers (the Agencies) provided clarity by issuing the Clean Water Rule. The Rule clarified the regulatory definition of "waters of the United States" as including traditional navigable waters, tributaries flowing into those waters, wetlands and other waters adjacent to traditional navigable waters or the tributary network, and certain other waters that could qualify for protection on a case-by-case basis if they had significant downstream effects. The Clean Water Rule is no longer in effect. In 2019, the

Agencies repealed the Rule and replaced it with the preexisting regulatory definition of "waters of the United States." That regulatory regime currently applies nationwide.

Plaintiffs portray the Clean Water Rule as having extended federal protections to any water across the country, no matter how inconsequential, and even to dry land. That is false. The foundation for the Rule was the "significant nexus" standard, which was described by Justice Kennedy in *Rapanos v. United States*, 547 U.S. 715 (2006), and drew on earlier Supreme Court precedent. Every circuit court to decide the question has concluded that the Clean Water Act protects waters meeting the significant nexus standard. A water qualifies as a "water of the United States" under that standard if it significantly affects the integrity of a traditional navigable water. Before issuing the Clean Water Rule, the Agencies undertook an extensive scientific inquiry to help them determine which waters satisfy that criterion. EPA issued a 400-page report that summarized over 1,200 peer-reviewed publications on the connections among wetlands, streams, rivers, and other waters. That report shows that the categories of waters that were protected by the Clean Water Rule significantly affect the integrity of downstream navigable waters, and therefore qualify as "waters of the United States." Contrary to Plaintiffs' arguments, the Rule was thus consistent with the Clean Water Act and Congress's constitutional authority to regulate and protect navigable waters.

Plaintiffs' Administrative Procedure Act (APA) arguments fail as well. The Agencies reasonably explained, and provided record support for, the distance limits adopted in the Rule's adjacency definition. These limits were also a "logical outgrowth"

of the proposal. Plaintiffs' other "logical outgrowth" claims fail because they concern

changes that were either insignificant or did not prejudice Plaintiffs.

Plaintiffs not only fail to support their merits arguments, but they also have not

shown that they would suffer any "irreparable harm" from the Rule that would warrant

injunctive relief. The Court should thus deny Plaintiffs' motion for summary judgment,

and grant Defendant-Intervenors' cross-motion for summary judgment, upholding the

legality of the Clean Water Rule against Plaintiffs' claims.[1]

## BACKGROUND

## I.     The Clean Water Act and "waters of the United States"

The Clean Water Act is a "cooperative federalism" statute, which allows states to

implement and enforce the Act's pollution-control programs if they choose to do so. *See*

*New York v. United States*, 505 U.S. 144, 167 (1992); S. Rep. No. 92-414, at 11 (1971), *as*

*reprinted in* 1978 U.S.C.C.A.N. 3668, 3678 ("The States are declared to have the primary

---

[1] Defendant-Intervenors respectfully preserve their argument that this case is moot, because the Clean Water Rule was repealed in 2019 and the Agencies have no intention of reissuing it. Although the Sixth Circuit found in 2020 that this case was not moot because of litigation in other courts challenging the Rule's repeal and replacement, *Ohio v. EPA*, 969 F.3d 306, 310 (6th Cir. 2020), other circuit courts in other cases have found similar pending litigation to be insufficient to maintain jurisdiction over a repealed law. *See Jackson v. Abercrombie*, 585 F. App'x 413, 414 (9th Cir. 2014); *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 208 (D.C. Cir. 2011); *Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1184 (10th Cir. 2000); *Miller v. Benson*, 68 F.3d 163, 164-65 (7th Cir. 1995) (per curiam). In addition, two district courts have dismissed parallel Clean Water Rule challenges as moot. *See* Order, *Texas v. EPA*, No. 15-cv-162 (S.D. Tex. Mar. 2, 2021), ECF No. 255; *Georgia v. Wheeler*, No. 15-cv-79, 2020 WL 6948800, at *4 (S.D. Ga. Jan. 3, 2020). In light of the Sixth Circuit's opinion in this case, however, Defendant-Intervenors will not pursue a dismissal on the basis of mootness in this Court unless the factual circumstances relevant to mootness change.

3

responsibility and right to implement [the statute's] goal."). For example, the Act makes it unlawful to discharge pollutants into federally protected waters without a permit. 33 U.S.C. §§ 1311(a), 1342, 1344. The statute allows, but does not require, the states to administer these permitting programs instead of the federal government. *See id.* §§ 1342(b), 1344(g). States may also adopt standards for federally protected waters that are more stringent than federal requirements. *See id.* § 1370; *see also PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 723 (1994) (Stevens, J., concurring) ("Not a single sentence, phrase, or word in the Clean Water Act purports to place any constraint on a State's power to regulate the quality of its own waters more stringently than federal law might require. In fact, the Act explicitly recognizes States' ability to impose stricter standards."). Thus, the Clean Water Act preserves states' responsibility and authority to control water pollution, while maintaining a uniform federal floor so that states are not pressured into relaxing water quality protections to compete for industry. *Cf. Hodel v. Va. Surface Mining & Recl. Ass'n*, 452 U.S. 264, 282 (1981) (recognizing that "[t]he prevention of . . . destructive interstate competition is a traditional role for congressional action").

The Clean Water Act's protections apply to "navigable waters," which the statute defines broadly as "waters of the United States." 33 U.S.C. § 1362(7). The Congressional committee responsible for this language chose to define "navigable waters" as "waters of the United States" so that the term would "be given the broadest possible constitutional interpretation." *Ashland Oil*, 504 F.2d at 1324 (quoting 118 Cong. Rec. 33,756-57 (1972) (statement of Rep. Dingell)). However, the statute itself does not define

4

"waters of the United States." Instead, the definition is set forth in regulations issued by the Environmental Protection Agency and Army Corps of Engineers, the agencies charged with implementing the Clean Water Act.

The Supreme Court first addressed the meaning of "waters of the United States" in 1985. In *Riverside Bayview Homes*, a unanimous Court held that the Army Corps reasonably defined "waters of the United States" to include "adjacent" wetlands, 474 U.S. at 133-35, which the regulations had defined as those that "form the border of or are in reasonable proximity to other waters of the United States," *id.* at 134 (quoting 42 Fed. Reg. 37,122, 37,128 (July 19, 1977)). The Court explained that the Army Corps had reasonably used its "ecological judgment" that these wetlands are "inseparably bound up with" traditional navigable waters because of their key roles in "protecting and enhancing water quality." *Id.* at 133-34.

In *Solid Waste Agency of Northern Cook County (SWANCC) v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), the Supreme Court addressed "waters of the United States" in the context of the Agencies' "Migratory Bird Rule." Under the Migratory Bird Rule, waters qualified as "waters of the United States" if they provided habitat to migratory birds and thus affected interstate commerce. *See* 51 Fed. Reg. 41,206, 41,217 (Nov. 13, 1986). But the Court held that "waters of the United States" did not include certain "isolated" ponds on the sole basis that they provided habitat for migratory birds. *See* 531 U.S. at 163-64, 171-72, 174. The Court explained that in *Riverside Bayview Homes*, "[i]t was the significant nexus between the wetlands and 'navigable waters'"

5

that had informed the Court's reading of the Clean Water Act as including the wetlands in that case. *Id*. at 167.

The Supreme Court's most recent case interpreting "waters of the United States," *Rapanos v. United States*, 547 U.S. 715 (2006), resulted in a split decision with no majority opinion. Four Justices joined a plurality opinion, and four Justices joined a dissent. Justice Kennedy issued an opinion concurring in the judgment. Drawing on the Court's opinions in *Riverside Bayview Homes* and *SWANCC*, Justice Kennedy found that a wetland has the requisite "significant nexus"—and is therefore a "water of the United States"—if "either alone or in combination with" other similarly situated wetlands, it "significantly affect[s] the chemical, physical, and biological integrity" of a traditional navigable water. *Id.* at 779-80. The four-Justice plurality, in an opinion authored by Justice Scalia, adopted a more cramped reading of "waters of the United States." The plurality asserted that "waters of the United States" extends only to "relatively permanent, standing or continuously flowing bodies of water" and "wetlands with a continuous surface connection" to those waters. *Id.* at 739, 742. The four dissenting Justices would have affirmed the Agencies' decision that the wetlands in question qualified as "waters of the United States." *Id.* at 788. However, they explained that, at a minimum, waters are protected under the Act if they satisfy *either* Justice Kennedy's significant nexus standard or the plurality's test. *Id.* at 810 & n.14 (assuming that Justice Kennedy's approach "will be controlling in most cases"). Every Court of Appeals to have decided the question has held that waters meeting Justice Kennedy's significant nexus test qualify as "waters of the United States." *See infra* note 3.

6

## II.     The Clean Water Rule

*Rapanos* and *SWANCC* engendered widespread confusion and uncertainty over the scope of the Act's coverage. In practice, after *Rapanos*, "almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination," 80 Fed. Reg. 37,054, 37,056 (June 29, 2015), to assess whether they had the requisite "significant nexus" to qualify as "waters of the United States." This case-by-case approach was time consuming, resource intensive, and created the potential for inconsistent findings. *See id.* In 2015, responding to calls for clarity and predictability, the Agencies issued a clarifying definition of "waters of the United States": the Clean Water Rule.

In formulating the Rule, the Agencies identified the significant nexus standard as the "key" to their interpretation of the Act. *Id.* at 37,060. The Agencies thus concluded that waters were "waters of the United States" if they, "either alone or in combination with similarly situated waters in the region, significantly affect the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, or the territorial seas." *Id.* To determine which waters have these significant effects, the Agencies engaged in an extensive, four-year-long rulemaking process. EPA prepared a report (the "Connectivity Report"), which synthesized over 1,200 peer-reviewed scientific publications addressing the connections among streams, wetlands, and downstream water bodies. *Id.* at 37,057; *see* Declaration of Jolie McLaughlin Ex. 1, Connectivity Report at ES-2. The draft Connectivity Report was peer reviewed by an expert panel created by EPA's Science Advisory Board. 80 Fed. Reg. at 37,062. The panel concluded

7

that the draft Connectivity Report was a "thorough and technically accurate review of the literature on the connectivity of streams and wetlands to downstream waters." McLaughlin Decl. Ex. 2, SAB Review of Draft Connectivity Report at 1.

Based on the Connectivity Report, as well as legal and policy considerations, the Clean Water Rule established a three-tiered framework for determining whether waters were "waters of the United States": (1) waters that categorically qualify; (2) waters that may qualify after an individualized showing that they have a significant nexus to a traditional navigable water or interstate water, and (3) waters categorically excluded. *See* 33 C.F.R. § 328.3(a)-(b) (2016).

Under the Rule, "tributaries" and "adjacent" waters were categorically protected as "waters of the United States." *Id.* § 328.3(a)(5)-(6) (2016). The Rule defined "tributary" as a water that "contributes flow, either directly or through another water," to a traditional navigable water or interstate water and has "a bed and banks and an ordinary high water mark." *Id.* § 328.3(c)(3) (2016). The Rule defined "adjacent" waters as those "bordering, contiguous, or neighboring" another covered water—including those waters: (i) within 100 feet of a traditional navigable water, interstate water, impoundment, or tributary; (ii) within the 100-year floodplain *and* 1,500 feet of a traditional navigable water, interstate water, impoundment, or tributary; or (iii) within 1,500 feet of a traditional navigable water or one of the Great Lakes. *Id.* § 328.3(c)(1)-(2) (2016). The Agencies explained that they were categorically protecting tributaries and adjacent waters, as defined in the Rule, based on the scientific evidence that they significantly affect the integrity of downstream waters. 80 Fed. Reg. at 37,058.

8

Other waters *could* qualify for protection under the Rule, depending on the results of an individualized significant nexus analysis, if they were not close enough to be adjacent but were within the 100-year floodplain of a traditional navigable water or interstate water, or within 4,000 feet of a traditional navigable water, interstate water, impoundment, or tributary. 33 C.F.R. § 328.3(a)(8) (2016). The Agencies protected these waters on a case-by-case basis because they concluded the scientific evidence showed that many, but not all, waters within these boundaries significantly affect the integrity of downstream waters. *See* 80 Fed. Reg. at 37,059.

The Agencies also excluded many waters from the Rule's definition of "waters of the United States." For instance, the Rule excluded non-floodplain waters more than 4,000 feet from another covered water, *see id.* at 37,090, as well as waste treatment systems, ephemeral features that did not meet the definition of "tributary," groundwater, and certain types of ditches, 33 C.F.R. § 328.3(b) (2016).

Plaintiffs' assertion that the Clean Water Rule "vastly expanded" the definition of "waters of the United States," Pls.' Mot. Summ. J. (Pls.' Br.) 9, PageID #1261, ECF No. 103, is incorrect. As compared to the text of the preexisting regulations, the Rule *narrowed* the scope of waters protected under the Act. 80 Fed. Reg. at 37,054. For instance, the prior regulations defined "waters of the United States" as including all "[t]ributaries," 33 C.F.R. § 328.3(a)(5) (2014), but did not limit what could qualify as a tributary. The Clean Water Rule limited "tributaries" to those with a bed, banks, and ordinary high water mark. 33 C.F.R. § 328.3(a)(5), (c)(3) (2016). The Clean Water Rule also omitted the prior regulations' protection of all waters that "could affect interstate

9

or foreign commerce." *Compare* 33 C.F.R. § 328.3(a)(3) (2014), *with* 33 C.F.R. § 328.3 (2016).

As compared to post-*Rapanos* implementation of the Agencies' pre-Clean Water Rule regulations, the Agencies predicted that the Clean Water Rule might slightly increase the number of evaluated waters found to be "waters of the United States," by 2.84 to 4.65 percent. 80 Fed. Reg. at 37,101. However, there is no evidence that the Clean Water Rule actually expanded the scope of the Act while it was in effect. According to data gathered by the Agencies since 2015, the U.S. Army Corps found a *smaller* percentage of waters analyzed under the Clean Water Rule to be protected as compared to waters analyzed under the prior regulations (which applied at various times since 2015, due to court stays of the Clean Water Rule and then its repeal). *See* Declaration of Jon Devine ¶¶ 10, 12 (53.2% of waters evaluated since 2015 under the prior regulations were found to be "waters of the United States," and 44.7% of waters evaluated since 2015 under the Clean Water Rule were found to be "waters of the United States").

## III. Litigation challenging the Clean Water Rule and subsequent rulemakings

Plaintiffs Ohio and Tennessee filed a complaint challenging the Clean Water Rule in July 2015, Am. Compl., ECF No. 20, and moved for a preliminary injunction in November 2015, Pls.' Mot. for Prelim. Inj., ECF No. 39. Other parties filed similar lawsuits in different district courts across the country. Several plaintiffs, including Ohio and Tennessee, also filed challenges to the Rule in the Courts of Appeals, due to uncertainty at the time regarding the Clean Water Act's judicial review provisions.

The circuit court cases were consolidated in the Sixth Circuit, which stayed the Clean Water Rule nationwide in October 2015, pending further review. *In re EPA*, 803 F.3d 804, 809 (6th Cir. 2015), *vacated sub nom. In re U.S. Dep't of Def.*, 713 F. App'x 489 (6th Cir. 2018). The Sixth Circuit found "no compelling showing that any of the petitioners"—including Ohio and Tennessee—would suffer immediate irreparable harm from the Rule. *Id.* at 808. But the court granted the petitioners' stay motion based in part on the court's concerns about the Rule's "ripple effects," as well as the need to "restore uniformity of regulation" while the case was pending. *Id.*

After the Sixth Circuit decided that it had exclusive jurisdiction to review challenges to the Clean Water Rule, this Court dismissed Ohio and Tennessee's lawsuit. *See* Order, ECF No. 54. However, in January 2018, the Supreme Court reversed the Sixth Circuit's decision and held that jurisdiction belonged in the district courts. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 624 (2018). As a result, the Sixth Circuit vacated its order staying the Clean Water Rule and dismissed the challenges to the Rule for lack of jurisdiction. *See In re U.S. Dep't of Def.*, 713 F. App'x 489, 490-91 (6th Cir. 2018).

In April 2018, this case was reopened, ECF No. 57, and Plaintiffs Ohio and Tennessee renewed their motion for a preliminary injunction, Pls.' Notice & Request, ECF No. 58. The Court denied Plaintiffs' motion, finding that Plaintiffs had failed to show that they would suffer immediate irreparable harm from the Rule. *See* Op. & Order at 7, ECF No. 86, PageID #1181; *see also* Order at 1, ECF No. 89, PageID #1196 (denying motion for reconsideration). In a parallel proceeding, a district court in

11

Oklahoma also denied a motion to preliminarily enjoin the Clean Water Rule, on similar grounds. *See Oklahoma ex rel. Hunter v. EPA*, No. 15-cv-381, 2019 WL 2288446, at \*5 (N.D. Okla. May 29, 2019). Four other district courts, however, entered regionally-limited preliminary injunctions of the Rule in other states. *See North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1060 (D.N.D. 2015) & Order, No. 15-cv-59 (D.N.D. Sept. 4, 2015), ECF No. 79 (limiting scope to plaintiff states); *Georgia v. Pruitt*, 326 F. Supp. 3d 1356, 1370 (S.D. Ga. 2018); *Texas v. EPA*, No. 15-cv-162, 2018 WL 4518230, at \*1-2 (S.D. Tex. Sept. 12, 2018); Order, *Or. Cattlemen's Ass'n v. EPA*, No. 19-cv-564 (D. Or. July 26, 2019), ECF No. 58. Two of those courts later granted summary judgment to the plaintiffs on certain claims, but declined to vacate the Rule. *See Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019); *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1382-83 (S.D. Ga. 2019). Both of those cases were subsequently dismissed as moot. Order, *Texas v. EPA*, No. 15-cv-162 (S.D. Tex. Mar. 2, 2021), ECF No. 255; *Georgia*, 2020 WL 6948800, at \*4.

In May 2019, Ohio and Tennessee appealed this Court's decision denying their preliminary injunction motion. *See* Pls.' Notice of Appeal, ECF No. 90. While Plaintiffs' appeal was pending, the Agencies under the Trump administration repealed and replaced the Clean Water Rule. The Agencies issued a rule repealing the Clean Water Rule (the "Repeal Rule") on October 22, 2019. *See* 84 Fed. Reg. 56,626 (Oct. 22, 2019). The Repeal Rule went into effect in December 2019. *Id.* A few months later, the Agencies finalized a new rule to replace the Repeal Rule. *See* 85 Fed. Reg. 22,250 (Apr. 21, 2020). That rule, called the Navigable Waters Protection Rule, took effect in June 2020. *Id.* Many parties, including Defendant-Intervenors Natural Resources Defense Council

(NRDC) and National Wildlife Federation, filed lawsuits challenging the Repeal Rule and the Navigable Waters Protection Rule.

In August 2020, the Sixth Circuit dismissed Plaintiffs' preliminary injunction appeal as moot. *See* 6th Cir. Op. at 2, ECF No. 98, PageID #1226. Because the Repeal Rule and Navigable Waters Protection Rule had superseded the Clean Water Rule, the Sixth Circuit held that a preliminary injunction of the Clean Water Rule "would lack any practical effect." *Id.* at 3, PageID #1227. The Sixth Circuit determined that the case as a whole was not moot, however, because it found a "fair prospect" that the Clean Water Rule could again take effect in the future, if courts were to invalidate the Repeal Rule and Navigable Waters Protection Rule. *Id.* at 5, PageID #1229. The Sixth Circuit's mandate issued on September 29, 2020. ECF No. 100.

On August 11, 2021, after nearly a year of inactivity in the case, this Court ordered the parties to file a notice as to whether there remained a live controversy. *See* Order, ECF No. 101. Shortly after that order, Plaintiffs moved for summary judgment. *See* Pls.' Mot. Summ. J., ECF No. 103.

Since Plaintiffs' summary judgment filing, two district courts have issued orders vacating the Navigable Waters Protection Rule. *See Pascua Yaqui Tribe v. EPA*, --- F. Supp. 3d ---, 2021 WL 3855977, at *6 (D. Ariz. Aug. 30, 2021), appeal filed Oct. 25, 2021, ECF No. 106; *Navajo Nation v. Regan*, --- F. Supp. 3d ---, 2021 WL 4430466, at *5 (D.N.M. Sept. 27, 2021). As a result, the 2019 Repeal Rule—which repealed the Clean Water Rule and recodified the regulatory definition of "waters of the United States"

that preceded the Clean Water Rule — is in effect throughout the country.[2] Meanwhile, the Agencies under the Biden administration have announced an intent to issue two new rulemakings: one restoring the regulatory regime that pre-dated the Clean Water Rule, and another establishing an entirely new regulatory definition of "waters of the United States." 86 Fed. Reg. 41,911, 41,911 (Aug. 4, 2021). The Agencies have not stated any intent to re-issue the Clean Water Rule.

Every other case challenging the Clean Water Rule, except for this one, has been dismissed or stayed. *See* Order, *Texas v. EPA*, No. 15-cv-162 (S.D. Tex. Mar. 2, 2021), ECF No. 255 (dismissed); *Georgia v. Wheeler*, No. 15-cv-79, 2020 WL 6948800, at *4 (S.D. Ga. Jan. 3, 2020) (dismissed); Stip. of Dismissal, *Oklahoma v. EPA*, No. 15-cv-381 (N.D. Okla. Jan. 7, 2020), ECF No. 135 (dismissed); Minute Order, *NRDC v. EPA*, No. 15-cv-1324 (D.D.C. May 6, 2016) (dismissed); Minute Order, *Puget Soundkeeper All. v. Wheeler*, No. 15-cv-1342 (W.D. Wash. Sept. 14, 2020), ECF No. 111 (dismissed); Minute Order, *Ariz. Mining Ass'n v. EPA*, No. 15-cv-1752 (D. Ariz. May 3, 2016), ECF No. 29 (dismissed); Notice of Voluntary Dismissal, *Waterkeeper All. v. EPA*, No. 15-cv-3927 (N.D. Cal. June 9, 2016), ECF No. 20 (dismissed); Order, *Petroff Trucking Co. v. EPA*, No. 19-cv-463 (S.D. Ill. Aug. 11, 2020), ECF No. 11 (dismissed); Mem. Op. & Order, *Wash. Cattlemen's Ass'n v. EPA*, No. 15-cv-3058 (D. Minn. Nov. 8, 2016), ECF No. 50 (dismissed); Mem. Op. & Order, *Murray Energy Corp. v. EPA*, No. 15-cv-110 (N.D. W. Va. Aug. 26, 2015), ECF No.

---

[2] *See* EPA, Current Implementation of Waters of the United States, https://www.epa.gov/wotus/current-implementation-waters-united-states (last visited October 31, 2021).

32 (dismissed); Order, *Pierce v. EPA*, No. 19-cv-2193 (D. Minn. Mar. 11, 2021), ECF No. 45 (dismissed); Order, *Se. Legal Found. v. EPA*, No. 15-cv-2488 (N.D. Ga. Oct. 14, 2021), ECF No. 37 (stayed); Order, *North Dakota v. EPA*, No. 15-cv-59 (D.N.D. June 22, 2021 & Sept. 21, 2021), ECF Nos. 338, 342 (stayed); Order, *Se. Stormwater Ass'n v. EPA*, No. 15-cv-579 (N.D. Fla. Sept. 23, 2021), ECF No. 110 (administratively closed); Order, *Am. Expl. & Mining Ass'n v. EPA*, No. 16-cv-1279 (D.D.C. May 4, 2018), ECF No. 21 (stayed and administratively closed); Order, *Waterkeeper All. v. Regan*, No. 18-cv-3521 (N.D. Cal. Sept. 16, 2021), ECF No. 125 (remanded and closed); Order, *Or. Cattlemen's Ass'n v. EPA*, No. 19-cv-564 (D. Or. Sept. 22, 2021), ECF No. 124 (stayed); Order, *Wash. Cattlemen's Ass'n v. EPA*, No. 19-cv-569 (W.D. Wash. Sept. 29, 2021), ECF No. 107 (stayed).

## STANDARD OF REVIEW

Plaintiffs' claims are governed by the APA, which instructs courts to set aside agency action that is "arbitrary, capricious . . . or otherwise not in accordance with law"; "contrary to constitutional right, [or] power"; "in excess of statutory jurisdiction"; or "without observance of procedure required by law." 5 U.S.C. § 706(2). "Review under the arbitrary and capricious standard is deferential[.]" *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). An agency action is arbitrary and capricious if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

<div align="center">**ARGUMENT**</div>

Plaintiffs' hyperbolic claims about the Clean Water Rule misstate the Rule's scope and ignore the extensive scientific record that supports it. First, the Rule reasonably used the "significant nexus" standard, drawn from Supreme Court cases, to determine which waters qualify for protection under the Clean Water Act, and the record shows that the Rule protected waters satisfying that standard. Second, the Rule fell comfortably within Congress's constitutional authority over navigable waters and waters that significantly affect navigable waters. Third, the Agencies explained—and provided record support for—the distance limits in the Rule's adjacency definition and the protection of tributaries (as defined). Finally, the Agencies complied with the APA's notice-and-comment requirements because they provided sufficient notice of the Rule's distance limits in the adjacency definition, and the other changes Plaintiffs complain about either did not harm them or were at most insignificant changes.

## I.    The Rule complied with the Clean Water Act and Supreme Court precedent

Plaintiffs do not dispute that the Agencies may lawfully interpret "waters of the United States" as including waters that satisfy the "significant nexus" standard. Instead, they erroneously argue that the Rule's "waters of the United States" definition included waters that fail to satisfy that standard. Pls.' Br. 29-30, PageID #1281-82. Plaintiffs' claims are belied by the extensive scientific record, which shows that tributaries and adjacent waters (as defined by the Rule) significantly affect the chemical, physical, and

<div align="center">16</div>

biological integrity of traditional navigable waters, as do waters covered under the Rule's case-specific significant nexus analysis. The Rule was therefore consistent with the significant nexus standard and the Clean Water Act.

A.     The Rule lawfully used the "significant nexus" standard

Every circuit court to have decided the question agrees that the Agencies may treat waters as "waters of the United States" if they satisfy the significant nexus standard. It was therefore reasonable for the Agencies to use that standard in the Clean Water Rule as the touchstone for determining which waters qualify for protection under the Clean Water Act.

Pursuant to Justice Kennedy's opinion in *Rapanos*, a nonnavigable water or wetland may be protected under the Clean Water Act if it has a significant nexus to a navigable water. 547 U.S. at 767. A significant nexus exists where "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. This significant nexus standard mirrors the objective of the Clean Water Act to protect "the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). And it is a concept that originated in the Supreme Court's *Riverside Bayview Homes* and *SWANCC* decisions. In *Riverside Bayview Homes*, the Court upheld the Army Corps's conclusion that adjacent wetlands qualified for protection based on the Corps's findings that they were "inseparably bound up with the 'waters' of the United States," 474 U.S. at 134, and have "significant effects on water quality and the aquatic ecosystem," *id.* at 135 n.9. In *SWANCC*, the

17

Court observed that this "significant nexus" was the reason why the Court in *Riverside Bayview* had interpreted the Act as covering those adjacent waters. *See* 531 U.S. at 167.

The Sixth Circuit has not yet decided whether Justice Kennedy's *Rapanos* opinion, including the significant nexus standard, is controlling. *See United States v. Cundiff*, 555 F.3d 200, 208 (6th Cir. 2009) (observing that because Clean Water Act jurisdiction was proper under each of the *Rapanos* opinions, the court did not have to decide which *Rapanos* opinion controlled). However, every Court of Appeals to have decided the question has held that waters meeting Justice Kennedy's significant nexus test qualify as "waters of the United States" under the Act.[3] This consensus among circuit courts makes sense, because five Justices in *Rapanos*—the four dissenting Justices and Justice Kennedy—would have found that *at least* those waters meeting the significant nexus standard were properly covered by the Act. *See Rapanos*, 547 U.S. at 810 & n.14 (Stevens, J., dissenting) (assuming Justice Kennedy's approach will be controlling in most cases). Not a single Court of Appeals has held that "waters of the United States" are limited to waters that satisfy the *Rapanos* plurality opinion. Plaintiffs' argument that the Rule protects more waters than the *Rapanos* plurality's test would allow, Pls.' Br. 28, PageID #1280, is therefore irrelevant, because the Rule satisfies the significant nexus standard.

---

[3] *See Sackett v. EPA*, 8 F.4th 1075, 1091 (9th Cir. 2021) (Justice Kennedy's "significant nexus" standard governs); *United States v. Robison*, 505 F.3d 1208, 1222 (11th Cir. 2007) (same); *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724 (7th Cir. 2006) (per curiam) (same); *United States v. Donovan*, 661 F.3d 174, 182-84 (3d Cir. 2011) (if either Justice Kennedy's or plurality's test is met, there is a "water of the United States"); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009) (same); *United States v. Johnson*, 467 F.3d 56, 66 (1st Cir. 2006) (same).

### B. The Rule lawfully protected certain categories of nonnavigable waters as "waters of the United States"

Plaintiffs argue that the Rule violated the Clean Water Act because it "*categorically* include[d] waters that are not traditionally navigable." Pls.' Br. 29, PageID #1281. But nothing in the Clean Water Act or Supreme Court precedent prohibits the Agencies from regulating categories of nonnavigable waters; in fact, the law is clear that such categorical regulation is permissible. In *Riverside Bayview Homes*, for instance, the Supreme Court explained that the Agencies can categorically regulate "all adjacent wetlands," as long as "in the majority of cases, adjacent wetlands have significant effects on water quality and the aquatic ecosystem." 474 U.S. at 135 n.9. In *Rapanos*, Justice Kennedy likewise confirmed that the Agencies "may choose to identify *categories* of tributaries that . . . are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters." 547 U.S. at 781 (emphasis added). Justice Kennedy instructed the Agencies to use a case-by-case approach in regulating wetlands adjacent to nonnavigable tributaries, "[a]bsent more specific regulations." *Id.* at 782. The Clean Water Rule provided these "specific regulations." Plaintiffs' assertion that the Agencies may only establish categorical protections for navigable-in-fact waters is baseless.

### C. The Rule satisfied the "significant nexus" standard

Contrary to Plaintiffs' claims, Pls.' Br. 29, PageID #1281, the Rule satisfied the significant nexus standard. The Rule protected tributaries and adjacent waters, as defined, based on the scientific evidence that these waters, either individually or

19

cumulatively, significantly affect the chemical, physical, and biological integrity of traditional navigable waters. *See* 80 Fed. Reg. at 37,068. The Rule also protected certain other waters on a case-by-case basis if they met the significant nexus test. *Id.* at 37,071.

### 1. Tributaries, as defined, have a significant nexus

The scientific record supported the Agencies' conclusion that tributaries, as defined in the Rule, have a significant nexus to traditional navigable waters and therefore qualify as "waters of the United States." Plaintiffs' conclusory arguments to the contrary—which ignore the record evidence—are meritless.

The Rule defined a protected "tributary" as a water that contributes flow to a traditional navigable water or interstate water, and also has a bed, banks, and ordinary high water mark. 33 C.F.R. § 328.3(c)(3) (2016). The Agencies explained that they were limiting the Rule's tributary definition to streams with a bed, banks, and ordinary high water mark based on evidence that these physical markings indicate "sufficient volume, duration, and frequency of flow." 80 Fed. Reg. at 37,066; *id.* at 37,076 ("A bed and banks and other indicators of ordinary high water mark . . . are only created by sufficient and regular intervals of flow."). Thus, contrary to Plaintiffs' caricature of the Rule, it would not have allowed federal regulation of "a slight depression on the side of a small hill," Pls.' Br. 11, PageID #1263, if that "slight depression" lacked the bed, banks, and ordinary high water mark that demonstrate a stream's regular and sufficient flow.

The evidence supported the Agencies' conclusion that tributaries, as defined in the Rule, satisfy the significant nexus standard. The scientific literature "unequivocally" shows that all tributary streams "exert a strong influence on the integrity of

downstream waters." McLaughlin Decl. Ex. 1, Connectivity Report at ES-2. Tributaries significantly affect the physical integrity of downstream waters because they are the main source of water for most rivers, and they carry sediment that is critical for maintaining the river network. McLaughlin Decl. Ex. 3, Tech. Support Doc. at 246-47; *see also* McLaughlin Decl. Ex. 1, Connectivity Report at 3-5, 3-13.[4] Tributaries affect the chemical integrity of navigable waters by trapping, storing, and transforming nutrients and contaminants before they flow downstream. McLaughlin Decl. Ex. 3, Tech. Support Doc. at 249; *see also* McLaughlin Decl. Ex. 1, Connectivity Report at 3-21 to 3-37. And tributaries affect the biological integrity of navigable waters by providing habitat and food to fish and other aquatic organisms. McLaughlin Decl. Ex. 1, Connectivity Report at 3-37 to 3-38; McLaughlin Decl. Ex. 3, Tech. Support Doc. at 254-56. Because of these physical, chemical, and biological effects, EPA's Science Advisory Board concluded that "[t]here is strong scientific evidence to support the EPA's proposal to include all tributaries within the jurisdiction of the Clean Water Act." 80 Fed. Reg. at 37,064.

Plaintiffs argue that the Rule's tributaries definition cannot be squared with the significant nexus standard because it included streams that are "normally dry." Pls.' Br. 29, PageID #1281. But the scientific record directly contradicts that argument. The evidence of connectivity and downstream effects of ephemeral streams (i.e., streams

---

[4] The "great majority" of waters that fall under the Rule's tributary definition are headwater streams, 80 Fed. Reg. at 37,058, which are the smallest channels where streamflows begin, McLaughlin Decl. Ex. 1, Connectivity Report at ES-8. In the northeastern United States, headwater streams contribute about 60% of the water volume in larger streams and rivers. McLaughlin Decl. Ex. 3, Tech. Support Doc. at 246.

that flow only after rainfall or snowfall) is "strong and compelling." McLaughlin Decl.
Ex. 1, Connectivity Report at ES-7. In arid regions like the Southwest, ephemeral
streams may be "infrequently connected" to a river but "critical to the maintenance of
[its] chemical, physical, and biological integrity." McLaughlin Decl. Ex. 2, SAB Review
of Draft Connectivity Report at 23; *see also* McLaughlin Decl. Ex. 4, EPA Ephemeral &
Intermittent Streams Report at 72 (ephemeral streams in the Southwest "have a
significant effect on the chemical, physical, and biological integrity of [downstream]
waters"). The cumulative effects of ephemeral streams can be especially significant. *See*
McLaughlin Decl. Ex. 1, Connectivity Report at 3-5 (noting that ephemeral streams and
other headwater streams "have a large cumulative or aggregate effect on the river
network"). For instance, like other streams, ephemeral streams "are major sources of
river water," *id.* at 2-18, and they transport large amounts of material downstream, *id.* at
3-22 to 3-23. They also provide critical habitat for animals that move throughout the
river network. *Id.* at 3-46. Thus, ephemeral streams "can have substantial consequences
on the integrity of downstream waters." *Id.* at ES-5; *see also id.* at 3-23 (materials
transported from ephemeral streams can have "significant effects").

The record also disproves Plaintiffs' claim that the Rule improperly protected
"remote" streams carrying only "minor" volumes of water. Pls.' Br. 30, PageID #1282
(quoting *Rapanos*, 547 U.S. at 781 (Kennedy, J., concurring in the judgment)). As
discussed above, the Rule's tributary definition was limited to streams with a bed,
banks, and ordinary high water mark, because these features ensure that the stream has
"sufficient volume, duration, and frequency of flow." 80 Fed. Reg. at 37,066. Moreover,

it was proper for the Agencies to consider the cumulative influence of streams, not simply each stream's individual impact. *See Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring in the judgment) (articulating the significant nexus standard as whether a wetland has effects "alone or in combination with" similarly situated wetlands). To the extent Plaintiffs claim that ephemeral and intermittent streams lack sufficient flow, or have "speculative" or "insubstantial effects on navigable-in-fact waters," Pls.' Br. 30, PageID #1282, they do not cite any evidence to support that claim. Justice Kennedy himself recognized that streams that are often dry can carry "torrents thundering at irregular intervals." *Rapanos*, 547 U.S. at 769 (noting that the plurality should not "presume that such irregular flows are too insignificant to be of concern," and citing the Los Angeles River as an example of a water that "often looks more like a dry roadway than a river" but can have "powerful and destructive" flows). In his view, the Agencies "can reasonably interpret the Act to cover the paths of such impermanent streams." *Id*. at 770.

Plaintiffs also lack support for their claim that the Rule unlawfully protected tributaries that "indirectly" connect to traditional navigable waters. Pls.' Br. 29, PageID #1281. Excluding streams with indirect connections would be inconsistent with both the Clean Water Act and the significant nexus standard, because streams in the upper reaches of a tributary network have significant effects downstream. *See* McLaughlin Decl. Ex. 1, Connectivity Report at 1-10, 3-2; *id*. at 3-1 ("Physical, chemical, and biological connections between headwater streams and downstream waters are fundamental to the structure and function of river networks . . . ."). As the Sixth Circuit

23

has observed, if there were no protection of upstream waters, they could become "open sewers," rendering the navigable downstream waters a "mere conduit for upstream waste." *Ashland Oil*, 504 F.2d at 1326.

Plaintiffs' complaint that the Rule impermissibly included tributaries with no "observable features" of a defined tributary, Pls.' Br. 30, PageID #1282, is also unpersuasive. The Rule's preamble clarified that the Agencies may allow a stream to qualify as a tributary even if it does not have an observable bed, bank, or ordinary high water mark, if reliable methods show that these features previously existed. 80 Fed. Reg. at 37,077. As the Agencies explained, allowing a tributary to be identified this way may be necessary if a stream has been illegally altered. *See id.* It would create a large loophole in the Clean Water Act if a water lost its protected status simply because someone unlawfully destroyed the physical indicia of flow that would render it protected. The Agencies reasonably interpreted the Act to avoid this loophole. *See County of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020) (finding a reading of the Clean Water Act unreasonable where it "would open a loophole allowing easy evasion of the statutory provision's basic purposes").

### 2. Adjacent waters, as defined, have a significant nexus

Plaintiffs assert that the Rule protected adjacent waters "*without regard*" to whether they substantially affect the integrity of navigable waters. Pls.' Br. 31, PageID #1283. Again, the record disproves that claim. The Rule protected the following waters as adjacent based on the Agencies' conclusions that they do have a significant nexus to traditional navigable waters: waters within 100 feet of another federally protected

24

water, and waters within the 100-year floodplain and within 1,500 feet of another federally protected water. *See* 33 C.F.R. § 328.3(c)(2) (2016). The scientific record supported the Agencies' conclusions.

First, waters within 100 feet of a river or stream are often connected to the river network via surface or subsurface flow. 80 Fed. Reg. at 37,085. Wetlands with surface or subsurface flow connections to the river network "clearly affect the condition of downstream waters." McLaughlin Decl. Ex. 1, Connectivity Report at ES-3. Waters within 100 feet of a river or stream are also often located in riparian areas, 80 Fed. Reg. at 37,085, which are "central to watershed water quality management" because they act as sinks that capture and transform sediments, nutrients, and pollutants that could harm downstream waters. McLaughlin Decl. Ex. 1, Connectivity Report at 4-11; *see also* McLaughlin Decl. Ex. 3, Tech. Support Doc. at 296. Riparian areas also provide important habitat to aquatic animals. *See* McLaughlin Decl. Ex. 1, Connectivity Report at 4-15 to 4-20. Because of these functions, riparian wetlands and other waters "profoundly influence downstream water integrity." *Id.* at ES-7. Waters within 100 feet of a protected river or stream therefore satisfy the significant nexus standard.

Second, the evidence shows that waters satisfy the significant nexus standard if they are within the 100-year floodplain of another federally protected water. According to the Connectivity Report, all floodplain wetlands "profoundly influence" the integrity of downstream waters, McLaughlin Decl. Ex. 1, Connectivity Report at ES-7, and are "highly connected" to them via surface water, groundwater, and biological connectivity, *id.* at 4-39. Floodplain wetlands exchange water and other materials with

25

downstream waters. *See id.* at ES-2 to ES-3; *id.* at 4-1, 4-39. They also capture and store stormwater, sediment, and pollutants that would otherwise flow into downstream waters, and they are integral parts of the river food web. *Id.* at ES-3. The Agencies did not determine that floodplain waters farther than 1,500 feet do not have a significant nexus; those were eligible for protection on a case-by-case basis. But the Rule imposed a 1,500-foot limit on wetlands that were categorically protected, to capture those that "most clearly" have the requisite nexus. 80 Fed. Reg. at 37,085.

In short, the record contradicts Plaintiffs' unsupported assertion that the Rule protected adjacent waters that were "insubstantially related" to traditional navigable waters. Pls.' Br. 31-32, PageID #1283-84. Although Plaintiffs try to equate them, *see id.* at 31, PageID #1283, the adjacent waters protected under the Rule are not like the "ponds and mudflats" at issue in *SWANCC*, which were "unconnected to other waters covered by the Act." *Rapanos*, 547 U.S. at 766 (Kennedy, J., concurring in the judgment); *see also Sackett v. EPA*, 566 U.S. 120, 124 (2012) (describing *SWANCC* as involving "an abandoned sand and gravel pit" that "was not adjacent to open water"). In *SWANCC*, the Agencies did not argue that the ponds at issue were adjacent waters, or significantly influenced the integrity of traditional navigable waters. Instead, the Agencies claimed that the waters qualified as "waters of the United States" because they affected interstate commerce by providing habitat to migratory birds. *SWANCC*, 531 U.S. at 163-65. By contrast, the Clean Water Rule protected adjacent waters on the basis that they significantly influence the integrity of traditional navigable waters. The Rule was thus

26

fully consistent with *SWANCC*, which recognized that adjacent wetlands could be protected based on their "significant nexus." *Id.* at 167.[5]

### 3. The Rule's use of a case-specific analysis for some waters complied with the "significant nexus" standard

The Rule allowed certain waters to qualify as "waters of the United States" if a case-specific analysis showed that the water, either alone or in combination with other similarly situated waters, has significant effects on the chemical, physical, or biological integrity of a traditional navigable water. 80 Fed. Reg. at 37,087-91. Plaintiffs argue that this case-specific analysis was inconsistent with Justice Kennedy's significant nexus test because it considered the cumulative effects of similarly situated waters and because the Agencies could "consider many things" in determining whether there is a significant effect. *See* Pls.' Br. 32, PageID #1284. Both arguments fail.

First, when describing waters that have a significant nexus, Justice Kennedy expressly stated that a wetland possesses the requisite nexus "if the wetlands, either alone or *in combination with similarly situated lands in the region*, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 780 (emphasis added). The Agencies' consideration of similarly situated waters was therefore consistent with Justice Kennedy's opinion. It was also consistent with the

_____

[5] Plaintiffs' citation to *Summit Petroleum Corporation v. EPA*, 690 F.3d 733, 744 (6th Cir. 2012), *see* Pls.' Br. 32, PageID #1284, is misplaced for several reasons. Among other things, in *Summit*, the court looked to the ordinary meaning of the word "adjacent" because it was interpreting regulations that used that word without defining it. 690 F.3d at 741-42. Here, the ordinary meaning of the word "adjacent" as used in the Clean Water Rule is not relevant, because the Rule expressly defined it.

advice of EPA's Science Advisory Board, which emphasized the need to evaluate the cumulative effects of streams and wetlands when analyzing their effects on the integrity of downstream waters. *See* McLaughlin Decl. Ex. 2, SAB Review of Draft Connectivity Report at 24-25. Plaintiffs cite no authority to support their claim that the Agencies were required to consider the effects of each water in isolation.

Second, Plaintiffs provide no support for their view that it was improper for the Agencies to consider "many things" as relevant to the significant nexus analysis. Pls.' Br. 32, PageID #1284. To the contrary, most of the functions listed by the Agencies were ones that the Supreme Court expressly identified as relevant to the inquiry. For example, the Agencies said they would consider a water's role in pollutant trapping, transformation, filtering, and transport; retention and attenuation of floodwaters; and runoff storage. 80 Fed. Reg. at 37,091. Justice Kennedy identified these functions as important. *See Rapanos*, 547 U.S. at 775, 779, 786. The Agencies also said that they would consider whether a water provides life-cycle dependent habitat to aquatic species. 80 Fed. Reg. at 37,091. In *Riverside Bayview Homes*, the Supreme Court found that it was reasonable for the Agencies to consider these biological functions, including "habitat . . . for aquatic . . . species," when evaluating whether an adjacent wetland qualifies for protection under the Act. *See* 474 U.S. at 134-35 (quoting 33 C.F.R. § 320.4(b)(2)(i) (1985)). And Plaintiffs' suggestion that waters cannot satisfy the significant nexus test if they perform "just one" significant function, Pls.' Br. 32, PageID #1284, is again wholly unsupported. It also makes no sense in light of the statute's objective to restore the "chemical, physical, *and* biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)

(emphasis added). A significant negative impact on "just one" of these aspects of a downstream water's integrity would undermine the statute's purpose.[6]

## II.    Plaintiffs' constitutional arguments are meritless

Plaintiffs' constitutional arguments are based on the false premise that the Rule "capture[d] many waters with no significant nexus to traditional navigable waters." Pls.' Br. 33, PageID #1285. As explained above, the evidence refutes such claims. The Rule was therefore permissible under both the Commerce Clause and the Tenth Amendment.

An interpretation of "waters of the United States" that includes waters with a significant nexus to navigable waters—like the Clean Water Rule—does not raise federalism or Commerce Clause concerns. *See* 547 U.S. at 782-83 (Kennedy, J., concurring in the judgment); *see also Cundiff*, 555 F.3d at 213 n.6 (noting that a Commerce Clause challenge to jurisdiction under the Clean Water Act in that case "would be rather tenuous"). Federal regulation of such waters is permissible because "[i]t has long been settled that Congress has extensive authority over [the] Nation's waters under the Commerce Clause." *Kaiser Aetna v. United States*, 444 U.S. 164, 173 (1979). And it would "make a mockery" of Congress's Commerce Clause powers if this

---

[6] Plaintiffs cite the Trump administration's proposed rule to repeal the Clean Water Rule, *see* Pls.' Br. 33, PageID #1285, which stated that the Rule's application of the significant nexus test "could mean" that "the vast majority" of water features "may" come within the Act's protections. 83 Fed. Reg. 32,227, 32,229 (July 12, 2018). Even if that assertion were true, it is a complaint about the supposed breadth of the Rule—not a basis for Plaintiffs' claim that the Rule was inconsistent with the significant nexus standard.

authority was limited to the navigable water itself, without extending to upstream waters that pollute it. *See Ashland Oil*, 504 F.2d at 1326; *see also Rapanos*, 547 U.S. at 782-83 (Kennedy, J., concurring in the judgment) (citing Supreme Court case law explaining, among other things, that regulation of tributaries may be required to manage a navigable water). In short, because the Commerce Clause authority extends to navigable waters, it also extends to waters that significantly affect them. And because waters covered by the Rule are properly regulated under the Commerce Clause, the Rule did not violate the Tenth Amendment by "intrud[ing]" on the States' "reserved powers," Pls.' Br. 33, PageID #1285. *See New York*, 505 U.S. at 156.

## III.  Plaintiffs' Administrative Procedure Act arguments are meritless

Plaintiffs' procedural attacks on the Rule's definition of tributaries and adjacent waters are meritless. The Agencies examined the relevant evidence and explained why it supported their decision to define "waters of the United States" as including certain tributaries and adjacent waters. Plaintiffs' notice-and-comment claims fail because the Rule's distance limits in the adjacency definition flowed logically from the Agencies' proposal.

### A.  Plaintiffs' arbitrary-and-capricious arguments fail

Plaintiffs' arbitrary-and-capricious arguments repeat some of the same claims—and mistakes—they make in arguing that the Rule violated the Clean Water Act. For example, Plaintiffs assert that the Rule's definition of "adjacent" waters protected waters "*without regard* to their effect on traditional navigable waters." Pls.' Br. 39, PageID #1291. That is not true. As explained above, pp. 24-27, the Rule's definition of

adjacent waters was based on the Agencies' conclusion that the waters within these geographic boundaries "clearly" have significant effects on the integrity of traditional navigable waters. 80 Fed. Reg. at 37,085-86. With respect to tributaries, Plaintiffs assert that the Agencies failed to cite "specific scientific evidence" that intermittent and ephemeral streams covered by the Rule "bear a significant relationship" to navigable waters. Pls.' Br. 39, PageID #1291. Again, that is untrue. As explained above, pp. 20-24, the Agencies relied on specific scientific evidence like the Connectivity Report, which was based on over a thousand scientific publications, 80 Fed. Reg. at 37,057, and which concluded that the science "unequivocally" shows that all streams—including "perennial, intermittent, and ephemeral streams"—"exert a strong influence on the integrity of downstream waters." McLaughlin Decl. Ex. 1, Connectivity Report at ES-2.

Plaintiffs' other attacks on the Rule's adjacent waters definition are equally flawed. First, they criticize the Agencies for using "bright-line distance thresholds." Pls.' Br. 39, PageID #1291. But while EPA's Science Advisory Board said that adjacency should not be defined "*solely* on the basis of geographical proximity or distance," 80 Fed. Reg. at 37,064 (emphasis added), the Agencies followed that advice by defining adjacency based on "*both* functional relationships *and* proximity," *id.* (emphasis added). For instance, the Rule's adjacent waters definition included waters within 100 feet of another covered water because waters within that distance "perform a myriad of critical chemical, physical, and biological functions" associated with nearby navigable waters. *Id.* at 37,085. The Rule's inclusion of waters within a floodplain is also based on that functional relationship; not just distance. *See id.* at 37,069 (noting that location within the

31

floodplain and proximity ensure that the *functions* of adjacent waters are effectively and consistently provided).

Second, the distance thresholds in the adjacency definition were supported by science and adequately explained. As discussed above, pp. 25-26, waters within a floodplain are highly connected to downstream waters. The Agencies explained that they specifically chose the 100-year floodplain, as opposed to another floodplain interval, in part for reasons of clarity. Two federal agencies—the Federal Emergency Management Agency (FEMA) and Natural Resources Conservation Service (NRCS)—have 100-year-floodplain maps for many areas of the country, which are "publicly available, well-known and well-understood." 80 Fed. Reg. at 37,083; *see also id.* (noting that several public commenters recommended use of FEMA and NRCS maps because they were easily accessible to the public). There is nothing arbitrary or capricious about the Agencies' decision to consider clarity and ease of administration when selecting the 100-year floodplain.

The Agencies also adequately explained why they limited the categorical protection of adjacent floodplain waters to those within 1,500 feet of another covered water. According to the Agencies, the 1,500-foot limit balances the twin goals of "protect[ing] vitally important waters within a watershed" that "most clearly have a significant nexus," while also "providing a practical and implementable rule." *Id.* at 37,085. Waters beyond 1,500 feet and within the floodplain may still be protected if a case-specific analysis shows they have a significant nexus downstream—the difference is only that the protection is not categorical. *Id.* at 37,058-59. Plaintiffs cite no authority

32

for the notion that the APA required the Agencies to explain more precisely why they chose a 1,500-foot boundary to demarcate these categories of waters, as opposed to 1,000 or 1,700 feet. The question is whether the Agencies' choice was "within a zone of reasonableness," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), not whether their numbers were precisely right.[7]

### B.      Plaintiffs' notice-and-comment arguments fail

Plaintiffs assert that the Agencies violated the APA's notice-and-comment requirements because aspects of the final Rule did not appear verbatim in the Agencies' proposal. *See* Pls.' Br. 35-37, PageID #1287-89. But the purpose of the notice and comment process is for agencies to consider and, if appropriate, make changes in response to comments. That is what the Agencies did here. A final rule must be a "logical outgrowth" of the rule originally proposed. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The distance limits in the Rule's adjacency definition satisfied that standard.

Plaintiffs complain that the final Rule's adjacent waters definition included distance limits, which did not appear in the proposed rule. Pls.' Br. 35-36, PageID #1287-88. But the distance limits were a logical outgrowth of the Agencies' proposal because they were "reasonably foreseeable." *Long Island Care*, 551 U.S. at 175. The

---

[7] Plaintiffs' brief includes a fleeting complaint about the Rule allowing waters to be protected on a case-by-case basis if they are located within 4,000 feet of another protected water. *See* Pls.' Br. 39-40, PageID #1291-92. But waters located within 4,000 feet of a river network can significantly affect the integrity of downstream navigable waters. *See* 80 Fed. Reg. at 37,089.

Agencies had proposed defining adjacent waters to include those within the floodplain or riparian area, or those with a "shallow subsurface . . . or confined surface hydrologic connection" to another covered water. 79 Fed. Reg. 22,188, 22,199 (Apr. 21, 2014). They requested comment on whether the latter form of coverage should be "regardless of distance" or whether there should be "specific geographic limits" for using hydrological connections as a basis for determining adjacency, such as "distance limitations." *Id.* at 22,208; *see also id.* at 22,209 (seeking comments on clarifying the "limits on adjacency," such as suggestions for "a specific distance"). Because the Agencies' request for comment made clear that they were contemplating using distance in the adjacency definition, the final Rule was reasonably foreseeable and did not run afoul of the APA.

Plaintiffs' claim that they could not have foreseen the need to comment on this issue is also undermined by the fact that other members of the public did. For example, some public comments requested that the adjacent waters definition include specific distance limits. *See, e.g.*, McLaughlin Decl. Ex. 5, Ky. Oil & Gas Ass'n Comments at 8; Ex. 6, Fla. Crystals Corp. Comments at 11; Ex. 7, N.M. Mining Ass'n Comments at 2-3. Other public comments, such as those submitted by Defendant-Intervenor NRDC, suggested that there should be no fixed distance limitation. *See, e.g.*, McLaughlin Decl. Ex. 8, Clean Water Action Comments at 6; Ex. 9, NRDC Comments at 62-63. These comments show that members of the public understood that distance limits might be

used to define adjacency, and "provide evidence that the notice was adequate." *Leyse v. Clear Channel Broad., Inc.*, 545 F. App'x 445, 454 (6th Cir. 2013).[8]

Plaintiffs' complaint that they did not receive adequate notice of the Rule's 4,000-foot limit on waters subject to a case-by-case significant nexus analysis, Pls.' Br. 36-37, PageID #1288-89, is also meritless. This provision made the Rule *narrower* than the proposed rule, which had not placed *any* distance limits on waters that could be subject to a case-specific significant nexus analysis. Because Plaintiffs wanted a narrower rule, they cannot show prejudice from a perceived lack of notice of this narrowing change. *See* 5 U.S.C. § 706(2) (providing for judicial review to take "due account . . . of the rule of prejudicial error"); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2385 (2020) (recognizing that, under 5 U.S.C. § 706(2), a plaintiff must show that they were harmed by the agency's alleged error); *Chrysler Corp. v. Dep't of Transp.*, 472 F.2d 659, 680-81 (6th Cir. 1972) (declining to consider plaintiffs' complaint that they were deprived of an opportunity to comment, because they were not prejudiced).

Finally, there is no merit to Plaintiffs' claim that the Rule violated the APA because the Rule's preamble noted that the Agencies may use "remote sensing" and "desktop tools" to identify whether a tributary once had a bed, banks, or ordinary high water mark that no longer exist. *See* Pls.' Br. 37, PageID #1289; *see also* 80 Fed. Reg. at

---

[8] The Sixth Circuit did not "already recognize[]" otherwise. *Contra* Pls.' Br. 37, PageID #1289. In 2015, the Sixth Circuit found, in a preliminary decision issued before merits briefing, that the rulemaking process for the distance limitations was "facially suspect," concluding that whether the Agencies' notice satisfied the logical outgrowth standard "require[d] closer scrutiny." *In re EPA*, 803 F.3d at 807, *vacated sub nom. In re U.S. Dep't of Def.*, 713 F. App'x at 490.

37,077. As explained above, p. 24, allowing that method of tributary identification would avoid a loophole whereby a stream would lose protection if someone unlawfully destroyed its physical indicia of flow. Plaintiffs describe this as a "subtle" change relative to the proposal. Pls.' Br. 37, PageID #1289. Indeed, as Plaintiffs acknowledge, *see id.*, the preamble to the proposed Rule already stated that the Agencies would use remote sensing and desktop analyses to identify tributaries. 79 Fed. Reg. at 22,195, 22,202, 22,214. Because the Agencies' clarification on this point was at most a minor change relative to the proposal, it did not violate the APA. *See Chrysler Corp. v. Dep't of Transp.*, 515 F.2d 1053, 1061 (6th Cir. 1975) (noting that courts usually overturn a regulation on the ground of inadequate notice when there was either "no notice at all" or there were "major substantive differences" between the proposed and final rule).

## IV. Plaintiffs fail to show that an injunction is warranted

A decision to grant or deny permanent injunctive relief is "an act of equitable discretion." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) ("An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."). To obtain an injunction, a plaintiff must face a "likelihood of substantial and immediate irreparable injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)); *see also United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) (plaintiffs must show that "failure to issue the injunction is likely to result in irreparable harm" (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068

36

(6th Cir.1998))); *City of Parma  v. Levi*, 536 F.2d 133, 135 (6th Cir. 1976) (a party seeking

an injunction must show irreparable injury "will result" if it is not granted).

Plaintiffs cannot make this showing. Even assuming it is "'reasonably' likely"

that the Clean Water Rule may again become effective someday, *see Ohio v. EPA*, 969

F.3d 306, 310 (6th Cir. 2020), Plaintiffs fail to show how the Rule did or will cause them

irreparable harm. Their claims of harm either repackage meritless legal arguments or

constitute unsupported factual allegations. For instance, Plaintiffs do not point to any

harm arising from the Rule's protection of a water body in Ohio or Tennessee during

the 16 months it was in effect there. Nor do they point to any concrete action that the

States wanted to take and were prevented from taking as a result of the Rule. Plaintiffs'

claims of irreparable harm fail.[9]

First, Plaintiffs argue that the Clean Water Rule irreparably harmed them

because the Rule supposedly violated their constitutional rights. Pls.' Br. 41-42, PageID

#1293-94. As discussed above, pp. 29-30, the Rule did not violate the Constitution, so

this argument fails. *See Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578

(6th Cir. 2002) (where plaintiff was unlikely to demonstrate a cognizable constitutional

---

[9] Plaintiffs suggest they did not obtain a preliminary injunction of the Rule in this Court because they were "unlucky." Pls.' Br. 49, PageID #1301. In fact, it is because they failed to provide sufficient evidence of harm to justify that relief. *See* Op. & Order at 2, ECF No. 89, PageID #1197 (finding in May 2019 that "[n]o evidence was adduced" to substantiate Plaintiffs' allegations that they would suffer irreparable harm absent preliminary relief); Op. & Order at 6, ECF No. 86, PageID #1180 (finding in March 2019 that Plaintiffs failed to show any "particularized harm" from the Rule that would occur while the case was pending); *but see* ECF No. 98 at PageID #1229-30 (vacating preliminary injunction denial as a result of appeal being dismissed as moot). Plaintiffs continue to fail to make a sufficient showing of harm to justify an injunction.

claim, "his argument that he is entitled to a presumption of irreparable harm based on the alleged constitutional violation is without merit"). Plaintiffs cite a number of cases where courts have found that a constitutional violation causes irreparable harm. *See* Pls.' Br. 41-42, PageID #1293-94. Those cases are both distinguishable and irrelevant: there is no constitutional violation in this case. Indeed, Plaintiffs do not even urge the Court, in the merits section of their brief, to find a constitutional violation—they urge the Court to find the Rule improper under the Clean Water Act, applying the constitutional-avoidance canon. *See id.* at 33-34, PageID #1285-86 ("Happily, the Court can avoid this constitutional problem by … holding that the 2015 Rule violates the Clean Water Act."). Avoiding a constitutional question is not the same as finding that Plaintiffs suffered a constitutional violation that creates irreparable harm.

Second, Plaintiffs argue that the Clean Water Rule "intrudes" on their sovereignty, *id.* at 42, PageID #1294, but that claim is premised on a mischaracterization of the Rule. According to Plaintiffs, the Rule has the "practical effect" of giving the federal government "primary control" over more state land and waters, and "preempts States' attempting any different approach." *Id.* at 43, 44, PageID #1295, 1296. That is misleading. Even assuming the Rule extended application of the Clean Water Act to additional Ohio and Tennessee waters as compared to the pre-Rule regulatory regime, it did not give the federal government "primary control" over those waters. Where the Rule applies, it simply requires parties to comply with certain minimum standards before destroying or polluting a water. State law continues to control in other respects. State law even continues to control the regulation of water quality where the Rule

38

applies (so the Rule does not prevent "any different approach") so long as the state water quality standards are at least as stringent as federal standards. *See* 33 U.S.C. § 1370 (states may enforce water pollution standards more stringent than those set by the Act, and nothing in the Act affects "any right or jurisdiction of the States" with respect to its waters).[10]

The cases Plaintiffs cite regarding federal impingement on state sovereignty are inapplicable. *See* Pls.' Br. 42-43, PageID #1294-95. Several involve courts enjoining the enforcement of state laws, *see Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers); *Barnes v. E-Systems, Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301 (1991) (Scalia, J., in chambers), or interfering with state criminal proceedings, *see Baze v. Parker*, 632 F.3d 338, 341 (6th Cir. 2011). Others were standing decisions, and involved federal interference with a state's ability to enforce or maintain its laws. *See State of Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232–33 (6th Cir. 1985); *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015). The other cases involve territorial disputes between states and tribes, or the preemption of state law by federal Indian law. *See Kansas v. United States*, 249 F.3d 1213, 1218, 1223-24 (10th

---

[10] Plaintiffs suggest that a harm to sovereignty is "purely legal" and "requires no additional evidence," Pls.' Br. 44, PageID #1296 (citing *Ohio v. Yellen*, --- F.3d ---, 2021 WL 2712220, at *6 (S.D. Ohio July 1, 2021)), but the court in *Yellen* did not say evidence was unnecessary to satisfy an injury requirement. It simply explained that whether a certain type of injury was sufficient for standing purposes was a legal question, and then went on to find that "Ohio in fact had suffered [that type of] injury." 2021 WL 2712220, at *6; *see id.* (agreeing that "Ohio bears a stronger evidentiary burden now (i.e., when seeking final relief) as compared to when it sought a preliminary injunction").

Cir. 2001); *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 476 (2d Cir. 2013);

*Akiachak Native Cmty. v. Jewell*, 995 F. Supp. 2d 7, 10, 16-17 (D.D.C. 2014).

In those cases, harm was premised on concrete actions the state would be

prevented from taking or required to take. By contrast, Plaintiffs point to nothing

concrete that they were unable or required to do as a result of the Rule—only a vague

affront to "sovereignty." Plaintiffs cite a proposed Ohio bill that would remove

ephemeral features from the definition of "waters of the state," and claim the Clean

Water Rule would "interfere" with that legislation. Pls.' Br. 44, PageID #1296 (citing

H.B. 175, 134th General Assembly, https://bit.ly/3sv7sWI); *see also* Ohio Rev. Code

Ann. § 6111.04 (prohibiting pollution of "waters of the state"). But the Rule, even were it

to come back into effect, would *not* interfere with that "contemplat[ed]" legislation,

*contra* Pls.' Br. 44, PageID #1296. The Rule would indeed protect some ephemeral

features under federal law. But Ohio is still fully empowered—as in the proposed

legislation—to exclude those features from the protections of *state* law. The Rule and the

proposed legislation are completely compatible.

In short, the Sixth Circuit was correct when it found, in 2015, that Plaintiffs made

"no compelling showing" that they would "suffer immediate irreparable harm" from

the Clean Water Rule "in the form of interference with state sovereignty." *In re EPA*, 803

F.3d at 808, *vacated sub nom. In re U.S. Dep't of Def.*, 713 F. App'x 489 (6th Cir. 2018).

Likewise, this Court was rightly "unpersuaded by the States' argument that

'[u]surpation from the States of their sovereign rights and responsibilities . . . would

40

constitute irreparable harm.'" Op. & Order at 6-7, ECF No. 86, PageID #1180-81, *but see* ECF No. 98 (vacatur of order, as a result of appeal being dismissed as moot).

The Court should disregard Plaintiffs' third claim of harm, which is that they have been put at a "competitive disadvantage," Pls.' Br. 44, PageID #1296, because it is conclusory and unsupported by any evidence. In a single sentence, Plaintiffs claim that the Rule deprived them of tax revenue by "reduc[ing] the ease of development" in Ohio and Tennessee relative to states that had obtained an injunction against the Rule. *Id.* at 45, PageID #1297. That is a factual claim made with no factual support. Plaintiffs cite only an out-of-state district court opinion that did not involve Ohio or Tennessee and that was issued before the Clean Water Rule ever went into effect. *Id.* Moreover, Plaintiffs' claim of "competitive disadvantage" is not even properly about the Rule itself: Plaintiffs' claim is that other courts' regionally-limited *injunctions* caused them to lose revenue. *See id.* In fact, most of those other injunctions—including the preliminary injunction that applied to the "neighbors of Ohio and Tennessee," *id.*—were issued in cases that have now been dismissed for lack of jurisdiction. *See Georgia*, 2020 WL 6948800, at *4 (dismissing case as moot); *see also* Order, *Texas v. EPA*, No. 15-cv-162 (S.D. Tex. Mar. 2, 2021), ECF No. 255 (same).

Finally, Plaintiffs argue that the Rule's promulgation harmed them by depriving them of the ability to comment, because the Rule was supposedly not a "logical outgrowth" of the proposal. Pls.' Br. 45-46, PageID #1297-98. This argument fails for the same reasons it fails on the merits: Plaintiffs had a full opportunity to comment on the Rule. *See supra* pp. 33-36.

41

Plaintiffs also fail to show that the public interest and the "balance of equities" favor permanently enjoining the Rule. *See eBay*, 547 U.S. at 391. As explained above, Plaintiffs' challenges to the legality of the Rule are meritless; thus, an injunction would not ensure the right application of "the law," *contra* Pls.' Br. 49, PageID #1301. Nor would an injunction in Ohio and Tennessee promote "uniformity," as Plaintiffs suggest, *see id*. It would simply increase slightly the number of states where the Rule would be enjoined. Plaintiffs fail to show why enjoining the Clean Water Rule, which presently has no effect, serves the public interest.

## CONCLUSION

For the foregoing reasons, if the Court reaches the merits of this case, it should deny Plaintiffs' summary judgment motion and grant Defendant-Intervenors' cross-motion.

Respectfully submitted this 1st day of November, 2021.

<div align="center">

s/ Rebecca J. Riley
*Trial Attorney*

Rebecca J. Riley
Jolie McLaughlin, admitted *pro hac vice*
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
Phone: (312) 651-7913
Email: rriley@nrdc.org, jdmclaughlin@nrdc.org

Catherine M. Rahm, admitted *pro hac vice*
Natural Resources Defense Council
40 West 20th Street
New York, NY 10011
Phone: (212) 727-4628
Email: crahm@nrdc.org

</div>

*Counsel for Defendant-Intervenors*
*Natural Resources Defense Council and*
*National Wildlife Federation*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2021, I electronically filed the foregoing

**DEFENDANT-INTERVENORS' COMBINED CROSS-MOTION FOR SUMMARY**

**JUDGMENT AND MEMORANDUM IN SUPPORT AND OPPOSITION TO**

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**, and attached declaration,

with the Clerk of Court using the CM/ECF system, which will send notification of this

filing to the attorneys of record.

s/ Rebecca J. Riley